No.  96-162

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JEREMY CORD WOODS,

Defendant and Appellant.

APPEAL FROM:          District Court of the First Judicial District,
                      In and for the County of Lewis and Clark,
                      The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

J. Mayo Ashley, Helena, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Jennifer Anders, Assistant Attorney
                      General, Helena, Montana; Mike McGrath, Lewis and Clark County
         Attorney,                Helena, Montana

Submitted on Briefs: April 17, 1997

Decided:  June 26, 1997
Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Following a jury trial in the First Judicial District Court, Lewis and Clark County, defendant Jeremy Cord Woods (Woods) was found guilty of two counts of deliberate homicide, and was subsequently sentenced to two consecutive life terms at the Montana State Prison. Woods appeals.

We affirm.

Woods presents two issues for our review, restated as follows:

1.     Did the District Court err in denying Woods's pretrial motion to suppress evidence of his confession?

2.     Did the District Court err in allowing Woods to proceed at trial pro se?

BACKGROUND

In July, 1994, Woods was an inmate at the Swan River Correctional Training Center (Swan River) in Montana. Swan River is commonly referred to as the "boot camp" because its training methods and overall atmosphere are based on military concepts of strict regimen and discipline. Participation in the Swan River program is voluntary, and participants, or "trainees," come from the Montana State Prison after completing a screening process, or are sent directly by the sentencing court.

The 120-day training program at Swan River involves a number of different steps, and a trainee's successful completion of the program is based on his behavior and willingness to proceed through each of the steps. If a judge so orders, a trainee who successfully completes the Swan River program may be released from incarceration, or may have his sentence reduced. Conversely, a trainee whose performance is unsatisfactory may be moved back a level within the program, may be transferred to the Lake County, Montana jail for a "time out," or may be sent back to the Montana State Prison.

Trainees are oriented to the Swan River program on two different occasions: once before they depart from the Montana State Prison, and again upon their arrival at Swan River. At both orientations, the trainees are informed that "100 percent disclosure" is expected of them, and that no confidentiality attaches to their disclosures. The theory behind the disclosure requirement is, in the words of Swan River Superintendent Dan Maloughney, "that if you are going to change your life, you cannot be hiding anything. And if you feel that there is something bothering you and prohibiting you from continuing on to make this change in your life, then we feel that should be taken out." According to Maloughney, unwillingness to comply with the disclosure requirement can under

certain circumstances rise to the level of unsatisfactory performance. Consequently, a trainee unwilling to comply can be moved back a level within the program, sent to the Lake County jail for a "time out," or returned to the Montana State Prison.

When Woods arrived at Swan River, he received the standard orientation and also talked with Superintendent Maloughney. In his discussion with Maloughney, Woods acknowledged that his successful completion of the program was dependent upon his performance. Woods indicated to Maloughney that he wanted to participate.

On July 24, 1994, Woods participated, along with a number of other trainees, in an anger management group session led by Swan River trustee Brien Mercer. Mercer was incarcerated at the facility but was acting as support staff with the counseling department. At some point during the course of the session, Woods indicated that he wanted to talk about a problem he was having. Mercer later testified that Woods began "expressing himself in a negative light," and one of the group members asked him, "What did you do, snuff somebody?" Woods responded that he had. When Mercer asked Woods if he, Mercer, should go on to someone else, Woods said no, he wanted to deal with his problem now. Woods then revealed that he had killed a woman and a child, but soon became very emotional and refused to say anything more.

Woods requested to leave the room, but Mercer refused out of concern for Woods's emotional well-being. Mercer was also concerned about his supervisor's response were he to allow Woods to leave the counseling session alone. Instead of allowing Woods to leave the room alone, Mercer ordered the other trainees to a place called "hard stand," where they normally went after leaving the group session room. Woods remained in the room with Mercer for about 20 or 30 minutes.

After Woods indicated that he wanted to speak with some staff persons, Mercer contacted Superintendent Maloughney. Maloughney informed Woods that he was not required to say anything more, but that Maloughney would make no promises if Woods did speak. Maloughney also informed Woods that he would face consequences if he admitted to criminal activity. Maloughney did not advise Woods of his Miranda rights.

Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Woods prepared a written statement which he gave to Maloughney on the same day, July 24, 1994. In the statement, Woods confessed to killing his girlfriend and his girlfriend's son. Woods explained in his statement that approximately one year earlier, he strangled Dawn Wallace with a power cord, hanged Wallace's son Jayme from the side of his crib with a stereo cable, then later placed both bodies in a 55-gallon drum that he dumped in a deserted area near the Helena airport. On July 25, 1994, Lewis and Clark County authorities received by fax from Swan River Woods's map of the location of the barrel. The authorities found the barrel and the human remains inside. The same day, July 25, 1994, Woods was charged by information filed in the Lewis and Clark County District Court with two counts of deliberate homicide.

After writing out his statement at Swan River, Woods requested that he be allowed to speak to the other trainees in his platoon about the murders. Woods's request was granted.

Woods was later transferred to the Montana State Prison, and he discussed the murders with various persons there. In particular, Woods discussed the murders with Terry Wilkinson, a hearings officer at the prison. Woods instigated the discussion, as, after Wilkinson introduced himself, Woods responded "I am the one who committed the double homicide," and proceeded to give Wilkinson detailed information about the murders. Woods also freely discussed the murders on a number of occasions with a physician's assistant at the prison.

On October 12, 1994, Woods filed with the District Court a motion to suppress any confessions or admissions he made while at Swan River. After a hearing held on November 30, 1994, the court denied Woods's motion, concluding that his confessions were entirely voluntary and were not taken in violation of his constitutional rights.

Prior to trial, Woods wrote a letter to the District Court requesting that his attorney be dismissed and that another attorney be substituted in her place. The court denied Woods's request for new counsel.

Trial commenced on October 1, 1995. Following voir dire, and outside the presence of the jury, Woods informed the court that he wanted to terminate representation by his now two attorneys. The court conducted an inquiry, then denied Woods's request. Woods insisted that he would not go forward with the case while represented by his present counsel. The court refused to postpone the trial, and Woods stated that he would represent himself. The court requested that Woods's attorneys remain on the case as standby counsel. Following a two day jury trial, Woods was found guilty of two counts of deliberate homicide. Woods appeals.

ISSUE ONE

Did the District Court err in denying Woods's pretrial motion to suppress evidence of his confession?

We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. New (1996), 276 Mont. 529, 533, 917 P.2d 919, 921. The District Court here denied Woods's motion to suppress evidence of his Swan River confession based upon its determinations that Woods's statements were voluntarily made, and that Woods was not the subject of a custodial interrogation when he confessed to the double homicide. Woods argues on appeal that the court erred because his statements were compelled, and because he was the subject of a custodial interrogation, or, in the alternative, was faced with "the classic penalty situation," State v. Fuller (1996), 276 Mont. 155, 162, 915 P.2d 809, 813, cert. denied, 117 S.Ct. 301 (1996), because he could have been returned to the Montana State Prison if he did not comply with the disclosure rule at Swan River. Thus, there are three sub-issues here: whether Woods's statements were voluntarily made; whether Woods was the subject of a custodial interrogation; and, whether Woods was faced with "the classic penalty situation." We shall address each of these sub-issues in turn.

A defendant may move to suppress evidence of his confession on the ground that

it was involuntary. Section 46-13-301, MCA. The State has the burden of proving by a preponderance of the evidence that a defendant's statements of confession or admission were voluntary, not compelled. Section 46-13-301(2), MCA. The State contends that it met its burden in this case. We agree.

The relevant facts here fully support the State's contention and the court's determination that "Woods' [sic] statements were the 'product of a rational intellect and free will,' and were wholly voluntary within the meaning of the Due Process Clause of the Fifth Amendment." Woods voluntarily chose to participate in the Swan River program, and, in accordance with standard procedure at Swan River, was informed of what was expected of him as a Swan River trainee prior to his departure from Montana State Prison and upon his arrival at Swan River. Woods, like all prospective trainees, was informed that full disclosure was a requirement at Swan River, and that no confidentiality would attach to any disclosures of past criminal activity. In addition, Woods spoke directly with Superintendent Maloughney upon his arrival at Swan River and at that time indicated his desire to participate in the program. Furthermore, Woods had the option of terminating his participation in Swan River if he did not or could not meet its requirements.

At the anger management group session on July 24, 1994, Woods stated that he needed to speak about something that was bothering him. Woods had tried to speak at an earlier session, but was not afforded time to do so. After Woods disclosed in general terms that he had killed two persons, Trustee Mercer, and then Superintendent Maloughney, spent time with Woods inquiring as to whether he wished to continue with his confession. Woods assured them that he wanted to continue. Finally, in the written confession that Woods gave to Maloughney, Woods wrote:

I make this statement of my own free will without threat, promise, or duress. I am not under the influence of alcohol or drugs.

Prior to his statements of confession, Woods was never interrogated about his past criminal activity, nor did the Swan River staff suspect that Woods was involved in the homicides. The evidence overwhelmingly supports the court's determination that Woods's statements were voluntary. The court correctly concluded not to suppress evidence of Woods's confession pursuant to 46-13-301, MCA.

Woods also argues that evidence of his confession should have been suppressed on the grounds that it was the result of a custodial interrogation, and he was not informed of his Fifth Amendment right against self-incrimination prior to making his confession.

As a general rule, the Fifth Amendment privilege must be asserted or it is waived. Fuller, 915 P.2d at 812. There are, however, exceptions to this general rule, where the failure to assert the privilege is excused. A person subjected to a custodial interrogation

must be informed that he has the right to remain silent, that any statements he makes may be used against him, and that he has the right to an attorney, either retained or appointed.

Miranda, 384 U.S. at 479. Under these circumstances, only if a defendant fails to assert the Fifth Amendment privilege after being informed of his right to assert it may his statements be used against him.

For the Miranda protections to apply, the defendant must be subject to a custodial interrogation, which the United States Supreme Court has described as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Similarly, this Court has stated that a custodial interrogation arises where the circumstances "are such that a reasonable person being interrogated would feel he was in custody or otherwise significantly deprived of his freedom." State v. Osteen (1985), 216 Mont. 258, 264, 700 P.2d 188, 193, overruled on other grounds by State v. Loh (1996), 275 Mont. 460, 473, 914 P.2d 592, 600. A custodial setting can be identified where "inherently compelling pressures ... work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda, 384 U.S. at 467. Finally, whether a person is in custody for purposes of Miranda is a factual question which is dependent upon the particular circumstances of the case. California v. Beheler (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279.

Here, the District Court, while acknowledging that Woods was incarcerated at Swan River at the time he made his confession, concluded that he was not "in custody" for Miranda purposes. The court reached this conclusion after considering the particular circumstances surrounding Woods's confession at the July 24, 1994 group session. The court noted that Woods, after disclosing to the other trainees that he had killed two persons, was confined to the group therapy room "for safety reasons rather than for interrogation." The court also noted while Woods was confined to the group therapy room, his requests to speak with "church people" and with Superintendent Maloughney were granted. The court found that:

> [Trustee] Mercer's decision to keep Woods in the therapy room was not for the purpose of coercing Woods into making further statements, but rather as a safety precaution and to allow time for Woods to calm down and decide what he wanted to do. Woods was still free to decide for himself whether he wished to discuss the matter further with staff.

The court's findings are supported by the testimony produced at trial, and its reasoning is in accordance with case law which we find persuasive. In State v. Warner (Wash. 1995), 889 P.2d 479, the Washington Supreme Court addressed a factual situation similar to that here, where a defendant made incriminating statements during group sex

offender therapy sessions while confined at a juvenile correctional facility.  The Washington Court concluded that the group therapy sessions did not constitute a custodial setting:

Assuming arguendo this was an interrogation, it must be "custodial" in order to fit within the Miranda exception.  When dealing with a person already incarcerated, "custodial" means more than just the normal restrictions on freedom incident to incarceration.  There must be more than the usual restraint to depart. [Citations omitted.] In State v. Sargent [(Wash. 1988), 762 P.2d 1127] there was a custodial interrogation where the questioning by the probation officer took place in a booth in the King County Jail's visiting area and the defendant was locked in his side of the booth.  In [State v.] Post, [(Wash. 1992), 826 P.2d 172] on the other hand, this court rejected the argument that an interview by a Department of Corrections psychologist was custodial where the interviewee was on work release, even though "Post was 'required' to submit to his evaluation in the sense that it was widely known that if individuals did not cooperate during the interview process, it was a factor considered against them." [Citation omitted.] We held that psychological compulsion is not enough to establish "custody" for Miranda purposes. [Citation omitted.] The circumstances surrounding Mr. Warner's disclosures cannot be considered "custodial" in the sense used in the relevant cases.

Warner, 889 P.2d at 483.  Similarly, in State v. King (Wash. App. Div. 1 1995), 897 P.2d 380, 387, aff'd, 925 P.2d 606, the Washington Court of Appeals applied the Warner rationale and held that "King was not 'in custody' for Miranda purposes [when he confessed to other crimes while participating in a sexual offender program] because no restraints were placed upon him beyond those incident to the ordinary incarceration to which he was already subject."  We hold that the District Court correctly concluded that Woods, although technically incarcerated, was nevertheless not "in custody" within the meaning of Miranda when he made his confession.

The District Court also determined that Woods's confession was not the result of an "interrogation" within the meaning of Miranda, which requires some degree of compulsion.  The court in United States v. Morales (2d Cir. 1987), 834 F.2d 35, explained:

Only questioning that reflects a measure of compulsion above and beyond that inherent in the custody itself constitutes interrogation the fruits of which may be received into evidence only after Miranda warnings have been given.  The questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the "will" of his examiner.

Morales, 834 F.2d at 38 (citations omitted).  The District Court here found that Woods's initial incriminating statements were voluntarily made in the presence of his fellow

trainees and trustee Mercer, and that it was the trainees' non-accusatory questions that prompted Woods to give a more detailed account of what happened. The court also found that Woods was not subjected to an interrogation subsequent to his initial disclosure:

Next, Woods spent approximately half an hour in the room with Brian Mercer. There was no evidence at the hearing to indicate what Woods might have said during that half hour. Mercer testified that he talked with Woods until he felt comfortable enough to speak with other people. However, there was no indication that Mercer interrogated Woods during that time period.

When Dan Maloughney came into the room to speak with Woods, Maloughney asked Woods what he needed. When Woods told him that he wanted to come clean with his past, Maloughney asked him if he was sure he wanted to do that. When Woods answered affirmatively, Maloughney simply asked him to make a written statement of what Woods wanted to say. Maloughney did not conduct extensive questioning of Woods to gain information about the crimes, nor did he use coercion or undue pressure to elicit incriminating information from Woods. Woods volunteered his statement without any compelling influence from Maloughney. The Court finds that this conversation did not constitute an interrogation.

Likewise, the statement made to the boot camp platoon several days later was volunteered by Woods. There was no evidence that he was coerced to stand up in front of his platoon and confess to the homicides. Woods asked to be allowed to make that statement.

The evidence shows that Woods, aware that no confidentiality would attach to any disclosures at Swan River, voluntarily confessed at the group session that he had killed two persons. In addition, the only questions asked of Woods at that time were posed by his fellow inmates, not police officers. There is no indication that those questions were probing or compelling. Moreover, there is no indication that Mercer, during his time alone with Woods following the group session disclosure, or, later, Superintendent Maloughney, in any way compelled Woods to confess. To the contrary, the evidence shows that Mercer and Maloughney asked Woods general questions about Woods's desire to continue speaking, or advised Woods of the consequences of a confession to criminal activity. We hold that Woods was not "interrogated" within the meaning of Miranda. Because Woods was neither "in custody" nor "interrogated," no Miranda protections attached to his confession at Swan River.

However, as his third argument Woods contends that his confession was protected by the Fifth Amendment because, at the time of his disclosures at Swan River, he was facing the "classic penalty situation." The United States Supreme Court in Minnesota v. Murphy (1984), 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409, explained:

There is ... a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege

[against self-incrimination] would lead to revocation of probation [or some other type of punishment] it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Murphy, 465 U.S. at 435.

This Court addressed a "classic penalty situation" in Fuller. In that case, we held that Fifth Amendment protections applied to Fuller's disclosures of past criminal activity because Fuller was required to make such admissions in order to maintain his place in a sexual offender treatment program and thereby avoid prison. Fuller, 915 P.2d at 814, 816. Woods contends that, like Fuller, he was subjected to a "classic penalty situation" because his confession was compelled by the threat of a return to prison if he did not comply with Swan River's "100 % disclosure" rule.

The State contends, however, that we need not reach the merits of this argument because Woods raises it for the first time on appeal. We agree. The record establishes that Woods's arguments below were that his confession was not voluntary, and that his confession was the result of a custodial interrogation and he was therefore entitled to Miranda protections. Woods did not argue below that his confession was the result of a "classic penalty situation." While Fuller was decided after the District Court issued its order denying Woods's motion to suppress, other "classic penalty situation" cases have long been in existence. See, e.g., Lefkowitz v. Turley (1973), 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274; Lefkowitz v. Cunningham (1977), 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1; Murphy (1984), 465 U.S. 420. Thus, Woods could have raised this argument below, but did not. Errors alleged for the first time on appeal must be disregarded. See 46-20-104(2) and -701(2), MCA. In addition, a defendant may not alter or expand his argument on direct appeal. State v. Greywater (Mont. 1997), ___ P.2d ___, ___, 54 St. Rep. 16, 19. Because Woods did not raise the "classic penalty situation" argument below, he has waived that argument for purposes of appeal.

We conclude that the District Court did not err in denying Woods's pretrial motion to suppress. The court's findings were not clearly erroneous. Moreover, the court correctly applied its findings as a matter of law. The evidence supports the court's determinations that Woods's statements were voluntarily made, and were not made as a result of a custodial interrogation. Finally, because Woods did not argue below that he was subject to a "classic penalty situation," he waived that argument for purposes

of his
appeal.

ISSUE TWO

Did the District Court err in allowing Woods to proceed at trial pro se?

Pursuant to the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution, a criminal defendant in Montana has the right to the assistance of counsel. A Montana criminal defendant also has the constitutional right to proceed at trial pro se. State v. Colt (1992), 255 Mont. 399, 403, 843 P.2d 747, 749. A defendant may waive the right to counsel if the district court determines that the waiver is made knowingly, voluntarily, and intelligently. Section 46-8-102, MCA; see also Faretta v. California (1975), 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581. This Court has also stated that a defendant's request to proceed pro se must be unequivocal. State v. Langford (1994), 267 Mont. 95, 99, 882 P.2d 490, 492, cert. denied, 115 S.Ct. 1128 (1995).

Woods contends that the District Court did not adequately advise him of the dangers and disadvantages of proceeding without counsel, citing United States v. Keen (9th Cir. 1996), 96 F.3d 425. In Keen, the court stated that three elements must be met in order to establish that a defendant's waiver of counsel was knowing and intelligent: the defendant's awareness of (1) the nature of the charges against him; (2) the possible penalties; and, (3) the dangers and disadvantages of self-representation. Keen, 96 F.3d at 427-28. Woods interprets Keen as prescribing the particular way in which a trial court must inquire into a defendant's waiver. Woods contends that the District Court here did not strictly abide by the Keen prescription. However, Woods's interpretation is flawed, as Keen does not require a court to employ a structured, formulaic approach when conducting its inquiry. Indeed, the Keen court stated:

Other circuits have prescribed a meticulous litany to be employed by the district court when it is faced with a prospective pro se defendant. Although such a methodology may have its advantages, we have never demanded an ironclad approach to this situation. It is not our intention to craft such an approach here. However, we do generally require that the defendant be made aware of the "three elements" of self-representation: "[I]t must be established that the defendant was 'aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation.'" The government bears the burden of showing that Keen's waiver of counsel was knowing and intelligent. Furthermore, "[t]hroughout this inquiry, we must focus on what the defendant understood, rather than on what the court said or understood."

Keen, 96 F.3d at 427-28 (citations omitted) (emphasis added).

In Colt, this Court rejected an argument similar to the one posed by Woods here,

that the district court should adhere to a strict inquiry when deciding whether to allow
self-representation:

This Court does not require district courts to adhere to a rigid set of requirements in ascertaining whether a defendant in a criminal proceeding has made a knowing and intelligent waiver of his right to counsel.  District judges are in the best position to determine whether the defendant has made a knowing and intelligent waiver of his right to counsel.... Requiring the district courts to specifically discuss the dangers and disadvantages of pro se representation is far beyond the scope of what Faretta or our case law requires.  Faretta requires that the accused "be made aware of the dangers and disadvantages of self-representation...."

Colt, 843 P.2d at 751.  We noted that "establishment of generic criteria by which the District  Court would by rote discuss certain specific dangers and disadvantages of self-representation will do little to protect the rights of the accused."  Colt, 843 P.2d at 752.

We stated that we would defer to the district court's judgment regarding a defendant's
waiver of counsel:

[I]t is the district judges who are in the best position to determine the extent, context, and degree of inquiry necessary to determine whether the individual before them has made a voluntary, knowing, and intelligent waiver of the right to counsel.  So long as substantial credible [evidence] exists to support the decision of the District Court that the defendant made a voluntary, knowing, and intelligent waiver, it will not be disturbed on appeal.

Colt, 843 P.2d at 752 (citing State v. Plouffe (1982), 198 Mont. 379, 646 P.2d 533).

The State contends, and we agree, that there is substantial evidence in the record showing
that Woods made a voluntary, knowing, and intelligent waiver of his right to counsel.  After the jury was impaneled and before trial began, the parties discussed several
pretrial matters in the judge's chambers.  At that time, Woods stated that he wanted to
terminate representation by his attorneys:

THE DEFENDANT:  Your honor, may I speak please?  At this point, I would like to voice--I wrote that letter to you about the communication between my attorneys and I.  At this point, I would like to, you know, voice my objection at this point.

THE COURT: To what?

THE DEFENDANT: To the fact that Randi Hood and Jim Obie are representing me at this point.  It is my wish to terminate their representation of me at this point.

The court then informed Woods that he had the right to represent himself, but advised against it:

THE COURT: You do have the right to represent yourself but you

would be crazy to do it in this case.

....

I understand your concerns and I understand that you think that you're not getting good representation. But you are getting good representation. So far I've seen absolutely no indication that your attorneys have done anything that doesn't measure up to high professional standards.

The exchange continued:

THE COURT: I think the problem here is that, and it is understandable, you're not an attorney. You don't understand the lawyers' strategy. You have to trust your lawyers, to a certain extent, that they know how to best proceed in your defense.

THE DEFENDANT: But I don't trust them. I don't trust them. Not since the suppression hearing.

THE COURT: Well --

THE DEFENDANT: What was said in that suppression hearing was a farce.

THE COURT: Well, your request is denied at this point. And if you want to -- if you want to challenge their competency as your attorneys, you're welcome to do that.

THE DEFENDANT: I'm not challenging them for competency, I'm saying they won't represent me in this case. If that means I must stand in that courtroom alone, then so be it. But they will not represent me in this case.

THE COURT: Well, you can continue to represent yourself. I'm not going to postpone this trial. We're going to trial today.

THE DEFENDANT: Then we go to trial today. But I will not -- then the --then -- but the defense counsel will not be representing me as --

THE COURT: I think you're crazy. Jeremy, look at me. You have a constitutional right to represent yourself. But these attorneys are a heck of a lot better at it than you are. And if you represent yourself, you are going to hang yourself in that trial.

THE DEFENDANT: I'm already hung, ma'm.

THE COURT: You decide whether you want to represent yourself or not. We're going to trial in 5 minutes.

Finally:

THE COURT: Jeremy, I know more about the law than you do.

THE DEFENDANT: Yes, ma'm.

THE COURT: I know more about the criminal process than you do.

THE DEFENDANT: Yes, ma'm.

THE COURT: And I'm telling you that these attorneys have done a very, very good job with you so far.  You may not think so, but I'm telling you that is true.

THE DEFENDANT: Why -- what happened at boot camp didn't come out.

THE COURT: Sometimes -- well, I'm just telling you right now that what I know about this case, and I've -- and I'm pretty familiar with what has been going on in this case, and these attorneys have done an excellent job with you and you have got to put your trust in them.

THE DEFENDANT: That is just it.  You didn't know what happened at the boot camp.

THE COURT: Well, now is not the time to tell me.

THE DEFENDANT: No, it ain't.  It was over and done with last year.  They had the chance to do it then.

THE COURT: Well, I am going to give you five minutes to think about this and then we've got to get the trial started.

THE DEFENDANT: I've already said my peace [sic].  There is nothing I can do.

THE COURT: Okay.  Let's go.

MS.  HOOD: You are representing yourself?

THE DEFENDANT: I just said you won't represent me.  There will be no defense representation in this case.

THE COURT: Okay.  That is up to you.  But Randi and Jim, I would like you to be standby attorneys.

The preceding exchange shows that the court attentively and thoroughly inquired into Woods's desire to waive his right to counsel.  It also shows that Woods repeatedly and steadfastly maintained his desire to terminate his attorneys' representation and proceed to trial on his own, even in the face of the court's advice to the contrary.  Woods's reasoning behind his decision, his dissatisfaction with his attorneys, was

clearly
stated.  Moreover, Woods's questions and responses indicate a rational intellect.  Finally,
there is no indication that Woods was in any way compelled or pressured to waive his
right to counsel.  We conclude that Woods voluntarily, knowingly, and intelligently
waived his right to counsel.

We also conclude, for many of the same reasons, that Woods's desire to proceed
pro se was unequivocal.  In Langford, we explained the rationale behind the
requirement
that the request be unequivocal:

It prevents a defendant from taking advantage of the mutual exclusivity of
the rights to counsel and self-representation.  A defendant who vacillates at
trial between wishing to be represented by counsel and wishing to represent
himself could place the trial court in a difficult position: If the court
appoints counsel, the defendant could, on appeal, rely on his intermittent
requests for self-representation in arguing that he had been denied the right
to represent himself; if the court permits self-representation the defendant
could claim he had been denied the right to counsel. [citation omitted.] The
requirement of unequivocality resolves this dilemma by forcing the
defendant to make an explicit choice.  If he equivocates, he is presumed to
have requested the assistance of counsel.

Langford, 882 P.2d at 493 (citing Adams v. Carroll (9th Cir. 1989), 875 F.2d 1441,
1444).  In that case, the record established a pattern in which Langford threatened
to fire
his appointed counsel, only to request a few days later that he be retained.  It was
not
until the pre-trial hearing that Langford requested that he be allowed to proceed
pro se.
Langford's request was as follows:

Well, I'm aware of the statute ... where it says you can let me make a
waiver of counsel if I make a ... knowing and a competent and intelligent
decision.  Well, clearly I know what I'm doing, I'm waiving my right to
counsel.  As far as competent, I think that's covered under do I know what
I'm doing, and it could be argued whether it was an intelligent decision or
not, I'm sure.  But as far as I'm concerned, my butt is the one that's on the
line.

Langford, 882 P.2d at 493.  We held that, although "[s]tanding alone, Langford's
request
appears to be unequivocal ... [t]aken as a whole, the record clearly reflects the
fact that
Langford's request to represent himself was equivocal."  Langford, 882 P.2d at 493,
494.
Here, however, the record shows that Woods never vacillated in expressing his desire
to
continue at trial on his own, even after repeatedly being advised against such a
course of
action by the court.  We hold that Woods's request to proceed pro se was unequivocal.

Woods also argues that his clearly stated dissatisfaction with his attorneys
required
the court to conduct a further inquiry into the competence of his attorneys, citing

State
v. Morrison (1993), 257 Mont. 282, 285, 848 P.2d 514, 516. Woods's argument lacks merit.

Woods's complaint focused on his attorneys' handling of the suppression hearing.

Judge McCarter, who heard Woods's complaint, presided over the suppression hearing as well. As the foregoing transcript excerpts indicate, Judge McCarter had observed the performance of Woods's attorneys throughout the case, particularly at the suppression hearing. There was no need here for Judge McCarter to conduct a further inquiry into the competence of Woods's attorneys.

CONCLUSION

As to Issue One, Woods's confession and related statements made at Swan River were voluntarily made, and were not the result of a custodial interrogation. Woods did not properly preserve, and therefore waived, his argument on appeal that the statements were the result of a "classic penalty situation." The statements were not protected by the Fifth Amendment, and we therefore conclude that the court correctly denied Woods's suppression motion.

With respect to Issue Two, there is substantial, credible evidence to establish that Woods voluntarily, knowingly, and intelligently waived his right to counsel. Similarly, there is evidence which establishes that Woods unequivocally indicated his desire to proceed pro se. Therefore, we conclude that the court did not err in allowing Woods to proceed pro se.

Affirmed.

/S/ WILLIAM E. HUNT, SR.


We Concur:

/S/ J. A. TURNAGE
/S/ JAMES C. NELSON
/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART