No. 01-105

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 14

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

ALBERT ERNEST INSUA,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                      In and For the County of Ravalli, Cause No. DC 99-65,
                      Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

            Chad Wright, Appellate Defender, Helena, Montana

       For Respondent:

            Honorable Mike McGrath, Attorney General; Jim Wheelis,
            Assistant Attorney General, Helena, Montana

            George Henry Corn, County Attorney, Hamilton, Montana

                     Submitted on Briefs:  November 14, 2002

                                 Decided:  January 27, 2004

Filed:

_____
                       Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Albert Insua (Insua) appeals from the judgment entered by the Twenty-First Judicial District, Ravalli County, following his conviction of one count of sexual intercourse without consent and three counts of sexual assault. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Whether the District Court adequately advised Insua of the dangers of representing himself.

¶4 2. Whether the District Court abused its discretion by limiting Insua's cross-examination, closing argument, and the calling of witnesses.

¶5 3. Whether the District Court admitted prejudicial evidence of other crimes.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 In July of 1999 Insua was charged with criminal production or manufacture of dangerous drugs and with sexual intercourse without consent upon a minor female, S.H. The Information was later amended three times to add three charges of sexual assault involving S.H. and two other minor females, A.C. and K.L. Upon Insua's motion, and over the State's objection, the District Court severed trial of the drug manufacturing charge from the trial of the sex crime charges. The drug trial commenced first, and a jury convicted Insua of criminal production or manufacture of dangerous drugs in May of 2000. That same month a jury trial on the sex crime charges commenced.

¶7 On the first day of trial, Insua assisted his appointed counsel, David Stenerson (Stenerson), who had represented Insua in the drug trial, to conduct jury selection. However,

before the State began presenting its case on the second day, Stenerson advised the District Court that Insua wanted to represent himself. Stenerson further advised the court that a person has the right to represent themselves "as long as the court sufficiently inquires whether the person knows what kind of right they're giving up," and that Stenerson had spoken with Insua and "[a]dvised him of the dangers of going pro se." The District Court then questioned Insua regarding his self-representation. The court asked him if he understood the role that the attorney plays in a criminal trial and he said that he did. The court warned him that "it would probably be in [his] best interests to have someone else ask questions of [the] children, rather than have [Insua] confront [the] witnesses directly . . . from a strategic point of view." The court also pointed out that the "extensive experience" Stenerson had as a trial attorney was "not something that [Insua could] just walk into." After Insua acknowledged this, the court allowed the trial to proceed with Insua representing himself and Stenerson acting as standby counsel.

¶8 During Insua's cross-examination of the State's witnesses, Insua attempted to demonstrate that poor relations between Insua and the victims' parents, and between Insua's daughter and A.C., were motivating factors that led to the victims' sexual allegations against Insua. He questioned P.L. and D.H., fathers to two of the girls, about their relations with Insua to show that the men were not "neighborly," as they had indicated in their direct testimony. Insua asked D.H. if D.H. had ever called Insua a "nigger lover." D.H. answered "no," but the District Court ordered the remark stricken. Insua then asked D.H. about "beating up a cop in California." D.H. denied the story, and the court then sustained the

3

State's relevance objection to the question. Insua asked P.L. if P.L. knew P.L. was suspected of theft at P.L.'s place of employment and "where did you get up the money for all those trading cars [sic] that you gave my children?" The court sustained the State's relevancy objections to these questions. The court also sustained the State's objection to Insua's questions about whether K.L. had been left with another man who had temporarily resided with K.L.'s family, when Insua could not satisfy the court's request that he demonstrate the relevancy of the inquiry.

¶9     Over Insua's objection, A.C. testified that she had seen Insua smoking marijuana and the presence of pipes in the "pantry," and that it smelled like marijuana there. The "pantry" was an outbuilding where Insua spent a lot of alone time and where one of the alleged sexual assaults occurred. Testimony during the trial indicated that Insua kept candy, dolls, children's toys and a television in the pantry.

¶10    After Insua had rested his case, the court and parties discussed jury instructions. The State expressed concern that Insua would argue, during his closing, that because the State had not presented evidence of physical trauma to S.H., the alleged victim in the sexual intercourse without consent count, the State had failed to prove the charge. The District Court barred Insua from making this argument, noting that Detective Clarkson testified, based on his training and experience, that it was not surprising that there was no evidence of physical trauma from digital penetration, the kind of physical trauma alleged here, and that Insua had failed to demonstrate that digital penetration would necessarily yield discernible trauma.

4

¶11 The jury found Insua guilty of sexual intercourse without consent and three counts of sexual assault. Insua, represented by counsel on appeal, asks for reversal and remand for a new trial.

## STANDARD OF REVIEW

¶12 A defendant's relinquishment of his right to counsel must be done voluntarily, knowingly and intelligently. *State v. Colt* (1992), 255 Mont. 399, 404, 843 P.2d 747, 750.

¶13 "We review discretionary trial court rulings for an abuse of discretion. . . . Discretionary trial court rulings include such things as trial administration issues, scope of cross-examination, post-trial motions, and similar rulings." *Konitz v. Claver*, 1998 MT 27, ¶ 32, 287 Mont. 301, ¶ 32, 954 P.2d 1138, ¶ 32 (citing *May v. First Nat. Pawn Brokers, Ltd.* (1995), 270 Mont. 132, 134, 890 P.2d 386, 388; *Harwood v. Glacier Elec. Co-op., Inc.* (1997), 285 Mont. 481, 486-87, 949 P.2d 651, 655).

## DISCUSSION

### ISSUE ONE

¶14 *Whether the District Court adequately advised Insua of the dangers of representing himself.*

¶15 "Article II, Section 24 of the 1972 Montana Constitution, and the right to a fair trial inherent in the due process clause of Art. II, Section 17, guarantee a defendant charged with a crime the right to assistance of counsel." *Colt*, 255 Mont. at 403, 843 P.2d at 749 (citing *State v. Enright* (1988), 233 Mont. 225, 228, 758 P.2d 779, 781). In addition, "'the Sixth Amendment right to counsel includes the right of an accused to personally make his own

defense.'" *Colt*, 255 Mont. at 403, 847 P.2d at 749 (quoting *State v. Brown* (1987), 228 Mont. 209, 213, 741 P.2d 428, 431).

¶16    Insua argues that the District Court did not advise him about the specific "dangers and disadvantages" of representing himself, and thus, he did not validly waive his right to counsel.  He contends that because we held in *State v. Spang*, 2002 MT 120, ¶ 22, 310 Mont. 52, ¶ 22, 48 P.3d 727, ¶ 22, that the right to representation under the Montana Constitution is broader than the federal right, our generalized inquiry as to whether substantial credible evidence exists that the defendant made a voluntary, knowing and intelligent waiver, is no longer acceptable under state constitutional standards and we should, therefore, adopt the three-part test employed by Ninth Circuit.

¶17    The Ninth Circuit has established that a waiver of counsel is valid when the court has advised the defendant of "'(1) the nature of the charges against him; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation.'" *United States v. Hayes* (9th Cir. 2000), 231 F.3d 1132, 1136 (quoting *United States v. Hernandez* (9th Cir. 2000), 203 F.3d 614, 624.  Insua concedes that he was advised of the first two elements, but not the third.  He argues that he was not warned about the rules regarding proper questioning of witnesses, cross-examination and permissible closing arguments.  He maintains that he should have been told that he would be treated the same as any other attorney, that he would be facing an experienced prosecutor, and that he would not be able to remedy errors caused by his own trial performance.

¶18    The State argues that the emphasis of the inquiry is not Insua's technical or legal knowledge, but rather his competency to waive his right to counsel, a decision which must be honored.  The State, emphasizing our opinion in *Colt,* which adopted the United States Supreme Court's standards in *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, and our decision in *State v. Woods* (1997), 283 Mont. 359, 942 P.2d 88, argues that the District Court's colloquy satisfied the *Faretta* inquiry.

¶19    *Faretta* required that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581-82 (citing *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275).  In applying the *Faretta* standard, we have repeatedly held that

> a trial court is not required to advise a defendant specifically of the dangers and disadvantages of self-representation as long as the court makes inquiry of the defendant to the extent it deems necessary to ensure that the defendant's waiver of counsel is voluntary, knowing, and intelligent.

*State v. Markuson*, 2003 MT 206,  ¶ 13, 317 Mont. 43, ¶ 13, 75 P.3d 298, ¶ 13; *see also, Colt*, 255 Mont. at 404, 843 P.2d at 747; *State v. Woods* (1997), 283 Mont. 359, 375, 942 P.2d 88, 97; *State v. Langford* (1994), 267 Mont. 95, 99, 882 P.2d 490, 492.

¶20    Our test, instead of merely requiring a court to recite a litany of dangers about self-representation that may or may not inform a defendant about all relevant concerns, requires that a court receive sufficient evidence to support a finding that a defendant's decision to

7

waive the right to counsel and exercise his right to represent himself is made voluntarily, knowingly and intelligently. The test focuses, not on what a defendant was told, but on a determination that a defendant understands his decision and is proceeding voluntarily. This is a stricter and higher standard, thus satisfying any increased measure of protection provided under the Montana Constitution's guarantees of the right to counsel and to a fair trial.

¶21 Here, Insua had recently experienced a criminal trial–his trial for criminal manufacture of dangerous drugs–wherein he had personally observed Stenerson's trial work. Insua had participated in jury selection with Stenerson in the sexual assault case, had been present during the suppression hearings in the case, and had taken law enforcement in college. It was apparent that Insua was generally familiar with the criminal trial process. When the court asked if Insua understood the role an attorney played, Insua responded that he did. Insua was also cautioned by the court that Stenerson had extensive experience as a trial attorney and that was "not something [Insua could] just walk into." Further, the court recommended that because Insua would be questioning children who had accused him of molesting them, "it would probably be in [Insua's] best interests to have someone else ask questions of those children rather than have [him] confront those witnesses directly . . . from a strategic point of view."

¶22 The District Court's questioning and Insua's responses indicate that Insua understood the decision he made and that he made the decision knowingly and voluntarily. "So long as substantial credible [evidence] exists to support the decision of the District Court that the defendant made a voluntary, knowing and intelligent waiver, it will not be disturbed on

8

appeal." *Colt*, 255 Mont. at 407, 843 P.2d at 752. The record reflects substantial credible evidence supported the District Court's decision. Accordingly, we hold that the District Court adequately advised Insua of the dangers of self-representation.

## ISSUE TWO

¶23 *Whether the District Court abused its discretion by limiting Insua's cross-examination, closing argument, and the calling of witnesses.*

*Cross-examination*

¶24 Insua contends that the District Court's restrictions on his cross-examination of witnesses violated his Sixth Amendment right to confrontation, citing the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution. In response, the State argues that the District Court gave Insua latitude to ask questions having a direct connection to a witness's motivation for bringing the charges and that the regulation of Insua's cross-examination was reasonable.

¶25 The record reveals that many of Insua's questions having a connection to a witness's credibility or motivation for bringing charges were permitted. Insua was permitted to ask A.C. whether she remembered having a dispute with Theresa, Insua's daughter, and about whether the girls were still friends, to which A.C. responded that they were "not really" friends. Insua asked P.L., K.L.'s father, whether P.L. remembered breaking the windshield of Insua's Rambler; whether P.L. had stated that P.L. hated Insua's guts; whether P.L. was envious of Insua's lifestyle; whether P.L. bathed with K.L.; and whether P.L. ever lied, the last to which P.L. replied "Oh, yeah." When examining C.H., S.H.'s mother, Insua asked

9

if she remembered accusations that Insua's wife had made regarding C.H. and Insua having an affair, to which the State objected as irrelevant. The court overruled the State's relevancy objection and allowed the questioning. Insua was allowed to ask S.H. if she remembered telling him stories about her father threatening her mother with a gun and about S.H. sucking her brother's big toe under some blankets. Insua asked J.L., K.L.'s mother, whether K.L. ever told her about K.L. coming into Insua's bathroom while Insua was taking a bath and asking to take a bath with him.

¶26 Questions with a dubious nexus to the charges against Insua were denied. Insua was not allowed to ask P.L. about being suspected of theft at his former employment, where he got money to buy trading cards or how P.L. felt concerning an incident between Insua and a mutual acquaintance after P.L. stated he did not recall the incident. Insua was barred from asking further questions of J.L., K.L.'s mother, about leaving K.L. in the care of a male family friend, after the court asked Insua to explain the relevancy of his questioning and Insua offered only "there's a possibility that this–this person was involved." Finally, on re-cross examination of D.H., Insua was not permitted to ask whether D.H. had called Insua a "nigger lover" or about "beating up a cop in California."

¶27 Rule 611(b)(1), M.R.Evid., provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Further, "[a] trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial." *State v. Nelson*,

2002 MT 122, ¶ 15, 310 Mont. 71, ¶ 15, 48 P.3d 739, ¶ 15 (citing *State v. Beavers*, 1999 MT 260, ¶ 36, 296 Mont. 340, ¶ 36, 987 P.2d 371, ¶ 36; *State v. Sullivan* (1994), 266 Mont. 313, 323, 880 P.2d 829, 836).

¶28 During the trial, the District Court verbally acknowledged that it was taking Insua's nonlawyer status into consideration in regulating his actions and would only "cut [Insua] off if we get over the line." The record reflects that the court did so, permitting Insua to ask a wide variety of questions which might establish a motivation on the part of the victims or their parents to bring a charge against Insua or otherwise challenge their credibility. Questions which were, at best, attenuated, were prohibited. Accordingly, we hold that the District Court did not abuse its discretion in governing Insua's cross-examination.

*Closing argument*

¶29 Insua argues that he did not have a fair opportunity to put on a defense because the District Court restricted his closing argument which challenged the State's lack of evidence of physical trauma. The State maintains that the District Court did allow Insua to argue that there was no evidence of trauma.

¶30 During a discussion among the parties and court about jury instructions, away from the jury, the State expressed concern that Insua would argue facts not established by the evidence, particularly, that he would argue that because there was no evidence of physical trauma to the alleged victim in the sexual intercourse without consent count, the State had failed to prove the offense. We have held that "a party may not in his or her closing

11

argument discuss or introduce facts not previously proven." *Harwood,* 285 Mont. at 492, 949 P.2d at 658.

¶31 The District Court, after reviewing the testimony of Detective Clarkson, concluded that the State had offered evidence indicating that physical trauma does not always occur in cases of digital penetration, and that Insua had not countered with any evidence indicating that physical damage would have been expected from such penetration. Therefore, the District Court instructed Insua that he was not to argue that digital penetration would yield discernible trauma to the victim.

¶32 Within this instruction, Insua was allowed to repeatedly assert in his closing argument that "there was no trauma." In addition, he also argued that there was no evidence: "[t]here's no proof of–there's no proof of any wrongdoing, even scientific proof." The District Court interrupted Insua's closing argument only at the following juncture:

> Mr. Insua: And if I had inserted my finger to the first joint, there would be some trace. There would be something there to say –
>
> The Court: Mr. Insua, you may not make that argument. I have ruled that you may not, and the jury will disregard the last argument.
>
> Mr. Insua: Yes. Your Honor, the – the detective stated that there was no sign of trauma.
>
> The Court: And you –
>
> Mr. Insua: I thought I could go that far, sir.
>
> The Court: You went beyond that, sir.

12

Only when Insua attempted to argue that digital penetration would necessarily have caused physical trauma to the victim did the District Court intervene.

¶33 Trial administration issues and similar rulings lie within the district court's discretion and we will not disturb the rulings unless there is an abuse of discretion. *Konitz*, ¶ 32. Insua was allowed great leeway during his closing argument. Because there was no evidence offered to support Insua's claim regarding the absence of physical trauma, the District Court did not abuse its discretion by restricting his argument.

*Calling of witnesses*

¶34 Insua also argues that the District Court erred when it refused to allow him to call the doctor who examined S.H., as a witness. After Insua had rested, the parties engaged in the discussion, referenced above, with the court about arguing facts not supported by evidence. Insua asserted that he had a right to point out that there was no evidence and to argue that the State had failed to call the physician who examined the victim to testify about what had been found during the examination. The State then requested permission to bring in the doctor for rebuttal purposes.

¶35 The District Court denied the State's request, reasoning that Insua had not presented any evidence which the physician's testimony could rebut. The court noted that the only testimony regarding the issue of physical trauma had been offered by a witness for the State, Detective Clarkson, who had stated that it was not surprising that there was no evidence of trauma in this kind of a case, and that this was "sufficient evidence on the issue to go to the jury by the testimony of the victim and also the testimony of Detective Clarkson as far as

13

what is surprising or not surprising from the lack of trauma." The court noted that Insua, on the other hand, had "produced no evidence that digital penetration yields discernible trauma." Insua responded by asking if he could call the victim's doctor as a witness. The court also declined this request, stating "[y]ou've rested."

¶36 Montana Rules of Evidence, Rule 611, directs the court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" to "make the interrogation and presentation effective for the ascertainment of the truth . . . [and] avoid needless consumption of time." Rule 611(a)(1) & (2), M.R.Evid. We have held that "[t]he court has a duty to conduct the trial in a speedy and fair manner and has a great amount of discretion in so doing." *State v. Dickens* (1982), 198 Mont. 482, 486, 647 P.2d 338, 341.

¶37 During his defense, Insua had the opportunity to call witnesses, including the physician, to rebut the State's evidence, but did not do so. At the time he requested permission to call the physician, Insua had rested and the trial had progressed to its final stages. At that point, it was clearly in the District Court's discretion to allow Insua to re-open his case, or to allow either party to call further witnesses. Rule 611, M.R.Evid.; *Dickens*, 198 Mont. at 486, 647 P.2d at 341. We see no abuse of the District Court's discretion, and affirm.

### ISSUE THREE

¶38 *Whether the District Court admitted prejudicial evidence of other crimes.*

14

¶39     Insua asserts that the evidence of his marijuana use was "bad character" evidence which was improperly admitted under Rule 404(b), M.R.Evid., because the State failed to meet any of the procedural requirements of the Modified Just Rule. *State v. Matt* (1991), 249 Mont. 136, 814 P.2d 52.  He argues that the marijuana evidence "achieved its intended purpose of proving that [Insua] was a bad man deserving of punishment," and therefore, he is entitled to a new trial.

¶40     The State asserts that the evidence was not introduced as other crimes or acts evidence pursuant to the Modified Just Rule, but rather, was offered and admitted pursuant to the transaction rule set forth in statute.  "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction."  Section 26-1-103, MCA; *State v. Brasda,* 2003 MT 374, ¶ 23, 319 Mont. 146, ¶ 23, ____ P.3d ____, ¶ 23; *State v. Bauer*, 2002 MT 7, ¶ 22, 308 Mont. 99, ¶ 22, 39 P.3d 689, ¶ 22.  The State notes that we have held that evidence may be admitted under this rule if it "tends to explain circumstances surrounding the charged offense" or is "closely related to and explanatory of the offense."  *State v. Wing* (1994), 264 Mont. 215, 225, 870 P.2d 1368, 1374.

¶41     The State contends that the evidence of marijuana use was properly admitted because it explained the circumstances surrounding the alleged sexual offenses at issue.  According to the State's theory, Insua had created a unique "world" in his "pantry" wherein he kept toys, dolls and candy, and where he watched television, smoked marijuana and spent time with the children.  One of the sexual offenses had allegedly occurred in the pantry, and the

15

State asserts that the jury was entitled to "the whole picture" about "the isolated and ominous setting of Insua's pantry, which he used for his careful grooming of children for sexual purposes."

¶42 Following the filing of the Amended Information, Insua requested severance of the drug manufacturing charge from the trial of sex crime charges. The State resisted, arguing not only judicial economy, but the relationship between the evidence in the two cases:

> Significantly, the pantry contains a TV, at least one chair, many, many toys appropriate for young children, and liquor bottles – all in addition to the marijuana paraphernalia and grow operation. A trier of fact might easily draw the obvious inference Defendant smokes marijuana, drinks alcoholic beverages as part of his mode of operation to effect the alleged sexual offenses in the pantry.
>
> . . . .
>
> The State's position is that all of Defendant's behavior in the pantry is inextricably related. This is Defendant's motus [sic] operandi. The entire atmosphere of the location of the crime is extremely important to the jury's perception of what was going on for months in the pantry. The marijuana should not be excised from this trial any more than the toys, the posters, or the liquor.

However, the District Court rejected the State's argument, and granted Insua's motion to sever the charges for trial. The drug charge was then tried first, followed by the subject trial on the sex crime charges.

¶43 While the challenged evidence regarding Insua's marijuana use may have been relevant to explain the transaction here, we conclude that the District Court abused its discretion in admitting the evidence in this trial in light of its earlier ruling which severed the trial of the charges. The court had earlier determined that the charges were sufficiently

16

distinct to warrant separate trials. Although the record does not disclose the District Court's reasoning for ordering severance, it is apparent that introduction of the marijuana evidence into the sexual crimes trial undermined, to some degree, the benefit Insua had gained from the court's earlier granting of his request for severance. After defending himself against the drug charge in the first trial, he was faced with the evidence again. However, it is our determination that the admission of the evidence in these circumstances was harmless error.

¶44    In *State v. Van Kirk,* 2001 MT 184, ¶ 37, 306 Mont. 215, ¶ 37, 32 P.3d 735, ¶ 37, we adopted a two-step analysis for determining whether error has prejudiced a criminal defendant's right to a fair trial. The first step is to inquire whether the claimed error is structural error, which is automatically reversible, or trial error. *Van Kirk*, ¶¶ 37, 39. Here, the error occurred during presentation of the evidence to the jury, and is trial error, requiring that we proceed to the second step of the analysis. *Van Kirk*, ¶¶ 40-41. Trial error is not presumptively prejudicial and is subject to review under the harmless error statute, § 46-20-701(1), MCA, which provides that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." *Van Kirk*, ¶ 40.

¶45    The tainted evidence here, evidence of Insua's marijuana use, does not go to the proof of an element of sexual intercourse without consent or sexual assault, and thus, the State must demonstrate that "no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction" of the sexual offenses. *Van Kirk*, ¶ 46; *State v. Nolan*, 2003 MT 55, ¶ 25, 314 Mont. 371, ¶ 25, 66 P.3d 269, ¶ 25.

17

¶46    The central dispute in this trial was whether the sexual acts were committed.  The trial transcript is 530 pages long and contains substantial testimony about the alleged sexual offenses. Insua's marijuana use was referenced by one of the child witnesses, A.C., whose testimony in this regard covers some two pages of the transcript.  The remainder of the transcript contains testimony from the three girls who testified that Insua sexually assaulted them, from parents of the girls explaining their involvement and observations, and testimony from the investigating detective.

¶47    Further, the prosecutor made only a very brief reference to the marijuana use during his closing argument, and then only in conjunction with the other items which the evidence revealed were kept in the "pantry"–toys, dolls, candy, TV and tequila.  The prosecutor did not comment on the marijuana use in isolation, and did not imply that conviction of the sex crimes was warranted because of the marijuana evidence.  Thus, the impact of the tainted evidence was minimal.  There was ample evidence, even without the marijuana reference, for the prosecution to develop and argue its theory that Insua's pantry "world" was designed to groom young victims or to commit a crime against them.  We conclude, therefore, that there was "no reasonable possibility that the tainted evidence might have contributed to the defendant's conviction." *Nolan*, ¶ 25.

¶48    Although the District Court abused its discretion in admitting evidence of Insua's marijuana use, we conclude, however, that the error was harmless.

18

¶49    Affirmed.


                                        /S/ JIM RICE


We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON