No. 96-312

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 48N

STATE OF MONTANA,

Plaintiff and Respondent,

v.

RICKIE DEAN MOSES,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable John S. Henson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Rickie Dean Moses, *pro se*

For Respondent:

Joseph P. Mazurek, Attorney General, Pamela P. Collins, Assistant Attorney General; Robert L. "Dusty" Deschamps III, Missoula County Attorney, Karen Townsend, Deputy Missoula County Attorney

Submitted on Briefs: June 4, 1998

Decided: March 16, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1. Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2. Rickie Dean Moses (Moses) appeals his conviction in the District Court for the Fourth Judicial District, Missoula County, of sexual assault, a felony, in violation of § 45-5-502, MCA. We affirm.

¶3. Moses raises the following issues on appeal:

¶4. 1. Whether the District Court erred in granting the State's motion in limine to exclude information contained in a Department of Family Services (DFS) file regarding the victim and members of her family.

¶5. 2. Whether Moses's counsel in his first trial was ineffective.

¶6. 3. Whether Moses knowingly, intelligently, voluntarily and unequivocally waived his right to the assistance of counsel in his second trial.

¶7. 4. Whether the State's expert witness committed perjury when she testified that she had had no prior contact with the victim's family.

## Factual and Procedural Background

¶8. On January 3, 1995, Moses was charged by Information with the offense of sexual assault. The Information alleged that on December 18, 1994, while visiting a homeless shelter in Missoula known as the Poverello Center, Moses knowingly

subjected nine-year-old M.W. to sexual contact without consent by touching her on her chest and buttocks.

¶9. A.B., M.W.'s mother, told the investigating officer that she, M.W. and M.W.'s 12-year-old sister, C.V., left their home early in the evening of December 18, 1994, because of an alcohol-related dispute with A.B.'s husband. They arrived at the Poverello Center after dark. After filling out the required paperwork, A.B. decided that she should move her car. Her older daughter, C.V., went with her; M.W. stayed behind.

¶10. A.B. was gone from the center for only a few minutes. Upon her return, M.W. told her mother that Moses had offered M.W. a candy bar and, as he placed it in her shirt pocket, he rubbed his hand over her chest and bottom. M.W. also stated that Moses pulled M.W. onto his lap and that, as he did so, she noticed that the zipper on his pants was down. C.V. related that, before she went outside with her mother, she saw Moses give M.W. the candy bar and then she saw him rub her sister's chest, buttocks and vagina. C.V. said she wanted to stop it, but that she didn't know what to do, so she left with her mother. After other individuals at the center told A.B. that they had also witnessed the incident, A.B. asked the center's night manager to call the police.

¶11. When the investigating officer arrived at the center, he spoke separately with A.B., M.W., C.V., the night manager of the center, and two residents of the center. All related similar accounts of what had transpired. Moses was subsequently charged with sexual assault.

¶12. Trial commenced on September 13, 1995, and although jury voir dire had begun, the trial was continued to September 20, 1995, to allow the defense further time to prepare. Moses's counsel represented that a DFS report on M.W. and members of her family had just been issued and the defense needed time to review the file.

¶13. On September 18, 1995, the State filed a Motion in Limine to prohibit Moses from introducing into evidence any information contained in the DFS file regarding M.W. or any other member of M.W.'s family. The motion was specifically directed to any information concerning other incidents of sexual assault involving M.W., any psychological evaluations of M.W., and any allegations of juvenile offenses

committed by M.W.

¶14. Trial resumed on September 20, 1995. The District Court held an in-chambers conference wherein the court heard argument on the State's motion in limine. The court subsequently granted the State's motion. In addition, M.W. was sworn in and an in-camera voir dire was conducted to determine her credibility. After questioning by the court, the State and defense counsel, the court determined that M.W. had the capacity to observe, to relate, and to tell the truth.

¶15. On September 21, 1995, during the course of deliberations, the jury reported that they were hopelessly deadlocked. The court ordered the jury discharged and declared a mistrial.

¶16. Moses's second trial commenced on October 23, 1995. Moses stated that he wished to represent himself at trial. The court granted Moses's motion to appear *pro se* and ordered that he be assisted by his former counsel and that counsel could advise Moses of rules of procedure only. The court advised Moses that the State's motion in limine prohibiting Moses from introducing into evidence any information from the DFS file regarding M.W.'s past was still in effect.

¶17. During the course of the trial, Moses moved the court to discharge standby counsel. After admonishing Moses about proceeding alone, the court granted his motion and standby counsel was discharged. On October 26, 1995, the jury found Moses guilty of sexual assault.

¶18. Thereafter, Moses caused to be issued several Subpoena Duces Tecum regarding the DFS file, a Friends to Youth file, and school records for M.W.'s sister. On January 24, 1996, the District Court ordered that the DFS and Friends to Youth files be delivered to the court for an in-camera review on the issues of the usefulness of the files at sentencing, their usefulness for appeal purposes and their usefulness, in general, in this case. After reviewing all of the materials in the files, the court determined that neither file contained information relevant to the trial or other proceedings. Thus, the court denied Moses's oral motion to review the materials. The court then ordered that all records that it had received for in-camera inspection be sealed for appeal purposes.

¶19. On March 5, 1996, the court sentenced Moses to 15 years in the Montana State

Prison. Although the court twice appointed counsel for Moses on appeal, Moses moved each time to have counsel dismissed. The court granted Moses's motions to dismiss counsel as well as his motion to appear *pro se* to appeal his conviction and sentence.

## Issue 1.

*Whether the District Court erred in granting the State's motion in limine to exclude information contained in a DFS file regarding the victim and members of her family.*

¶20. The standard of review for evidentiary rulings is whether the District Court abused its discretion. *State v. Fenton*, 1998 MT 99, ¶11, 958 P.2d 68, ¶11, 55 St.Rep. 389, ¶ 11 (citing *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263). The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *Fenton*, ¶ 11 (citing *Gollehon*, 262 Mont. at 301, 864 P.2d at 1263).

¶21. Moses asserts that the District Court abused its discretion when it granted the State's motion in limine because it prevented him from adequately cross-examining M.W. and her sister regarding their credibility. The State argues that Moses is barred on appeal from raising any objection to the granting of the motion in limine because Moses stated at the start of the second trial that he had no problem with the court's ruling on this motion from the first trial remaining in effect during the second trial.

¶22. After jury selection in the second trial, the State inquired whether the motion in limine granted in the first trial was still in effect:

MS. TOWNSEND [prosecuting attorney]: I guess the only other thing I wanted to clarify, in the previous trial we had some motions that the Court granted especially about going into [M.W.'s] past, and I'm assuming that those are still in force and effect for this particular trial as well?

THE COURT: That was my assumption.

DEFENDANT MOSES: That was mine, too.

I wanted to ask the Court if that--particularly the motion in limine--is that re-filed in its entirety and word for word.

THE COURT: Yes. And it's still in effect.

DEFENDANT MOSES: Okay.

THE COURT: There has been no motion to set it aside or whatever. I assumed we were going to proceed on that basis.

DEFENDANT MOSES: Yeah.

MS. TOWNSEND: I just expect that the mom will be testifying this afternoon, and I wanted to make sure that was in effect prior to his Cross-examination of the mother so--

THE COURT: What she's saying is she's going to call the mother this afternoon.

DEFENDANT MOSES: Right.

THE COURT: And it's her understanding that the motion in limine is still in effect.

Do you have any problems with that?

DEFENDANT MOSES: No. . . .

**¶23. This Court has consistently stated that before it will address an issue on appeal, a defendant must show that he has first raised the issue in the district court. *State v. Woods* (1997), 283 Mont. 359, 372, 942 P.2d 88, 96-97. In other words, the district court should be given the first opportunity to correct any trial errors. *State v. Schmalz*, 1998 MT 210, ¶ 11, 964 P.2d 763, ¶ 11, 55 St.Rep. 889, ¶ 11 (citation omitted). In addition, § 46-20-104(2), MCA, provides:**

Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affects the judgment.

Failure to make a timely objection during trial constitutes a waiver of the objection . . . .

**¶24. Moses failed to object to the court's ruling on the DFS file from the first trial remaining in effect during the second trial. Hence, this claim has not been properly preserved for appeal and we will not address it.**

## Issue 2.

*Whether Moses's counsel in his first trial was ineffective.*

**¶25. Moses had three separate counsel prior to his first trial. He contends that all three counsel were constitutionally ineffective pursuant to the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, for failing to locate certain witnesses. He also contends that his trial counsel was ineffective for failing to impeach C.V. with information from the DFS file regarding her credibility and for failing to move to exclude statements M.W. and C.V. gave to the investigating officer 18 days after the incident which were more detailed than the statements they gave officers shortly after the incident. Moses asserts that if his counsel had not been ineffective, he would have been acquitted rather than being subjected to a second trial and eventually convicted. The State argues that Moses cannot assert ineffective assistance of counsel at his first trial because that trial ended in a mistrial and the legal effect is as if the first trial had never taken place.**

**¶26. This Court has stated that the general rule of law is that where the first proceeding results in a mistrial, the parties are placed in the same position as if there had been no trial in the first place. *State v. Van Dyken* (1990), 242 Mont. 415, 427, 791 P.2d 1350, 1358, *cert denied* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 251; § 46-16-701, MCA. Any alleged errors made by counsel in Moses's first trial could not have been prejudicial to Moses because he had the opportunity to correct those errors in his second trial. Moreover, Moses has already obtained the relief he would have received if his counsel were found to be ineffective, i.e., a new trial.**

## Issue 3.

*Whether Moses knowingly, intelligently, voluntarily and unequivocally waived his right to the assistance of counsel in his second trial.*

**¶27. The Sixth Amendment of the federal constitution has been interpreted to include a defendant's right to self-representation.** *Faretta v. California* **(1975), 422 U. S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562. In addition, Article II, Section 24 of the Montana Constitution provides that "the accused shall have the right to appear and defend in person and by counsel" in all criminal prosecutions. However, when a defendant seeks to waive his or her right to counsel, the trial court must ascertain whether that waiver is made "knowingly, voluntarily, and intelligently." Section 46-8-102, MCA. So long as substantial credible evidence exists to support the district court's decision that the defendant made a voluntary, knowing and intelligent waiver, that decision will not be disturbed on appeal.** *State v. Colt* **(1992), 255 Mont. 399, 407, 843 P.2d 747, 752 (citations omitted). Furthermore, this Court has adopted an additional requirement that the request to represent oneself must be unequivocal.** *State v. Langford* **(1994), 267 Mont. 95, 99, 882 P.2d 490, 492.**

**¶28. Moses argues that he did not knowingly, intelligently, voluntarily and unequivocally waive his right to the assistance of counsel. He also asserts that the District Court failed to specifically discuss with him the dangers and disadvantages of appearing** *pro se***. However,** *Faretta* **only requires that the accused "be made aware of the dangers and disadvantages of self representation."** *Faretta***, 422 U.S. at 835, 95 S.Ct. at 2541.**

**¶29. It is evident from the following exchange prior to the start of the second trial that the court and standby counsel did try to make it clear to Moses what would be required of him if he appeared** *pro se* **and what standby counsel's role would be in the proceedings:**

MR. BECCARI [standby counsel]: I can confer with him.

The way this works, you will have to do the voir dire, and then you can confer with me if you have any specific problems, and then I can help you go through the list and show you how to pick and choose the jurors and how to treat them. But you have to get up there and ask the questions.

DEFENDANT MOSES: All right. All right.

MR. BECCARI: Is that all right with you?

DEFENDANT MOSES: I guess.

MR. BECCARI: It's either all or nothing.

. . .

THE COURT: As I understand it--I'll give counsel an opportunity to correct me here--if you choose to represent yourself, Mr. Moses, it must be voluntarily, you cannot have been coerced in any way. Now, on some occasions the defendant simply wishes to go ahead and represent himself, no counsel present. Now, I can order Mr. Beccari to sit at the counsel table with you and be available to you in the event that you'd like to confer with him, but I have placed just a horrendous burden on him by giving you the opportunity to in effect have a tag team match out here and you conduct one part of the trial and then suddenly turn around and ask Mr. Beccari to conduct the next part of the trial. It just presents a horrible situation for the Court and for yourself and Mr. Beccari.

DEFENDANT MOSES: Then I'll represent myself then, I guess.

. . .

THE COURT: Now you can waive his right to be present at all or I can order him to be seated at the table with you in the event that you'd like to confer with him.

DEFENDANT MOSES: Yeah, I would like to have him in there.

THE COURT: I'll order that Mr. Beccari be seated at the table, and he can confer with you, if you wish to confer with him; but, by the same token, he's--he's going to assume a passive role.

Do you know what that means?

DEFENDANT MOSES: Yes.

THE COURT: And you will be the counsel; you will assume the active role.

DEFENDANT MOSES: Okay.

THE COURT: He's not going to be making objections for you. He's not going to be making motions for you. By the same token, if you wish to confer with him and then make a motion or objection, why, that will be your prerogative. But he's going to be passive-- how should I put it?--counsel for you in that sense.

Do you understand all that.

DEFENDANT MOSES: Yes

**¶30. The prosecuting attorney also attempted to clarify for Moses exactly what he would be up against:**

MS. TOWNSEND: Mr. Moses, you understand that, if you are representing yourself, that I will have the opportunity to object to questions that you want to pose and that--that the Court will rule on them, that some of them may not be admissible--some of them--and you will have to handle those kind of objections if I raise an objection to any of your questions, that's part of the job of representing yourself, in the same way if you think that any of my questions are objectionable, you have to pose the objection, it will not be Mr. Beccari that will be doing that?

DEFENDANT MOSES: Yes, I understand how that works and everything.

Are you going to be objecting as to the way I ask the question or the question itself?

I mean, my questions are going to be to the point and strictly to what's been submitted as state--or statements made by the witnesses.

MS. TOWNSEND: I can't answer that because I don't know exactly what the question is now. It may be to the form of the question, which means the way you're asking it, or it may be that the question itself--it may be my position that the question is inadmissible and therefore you can't ask it. And, obviously, until I hear the question, I can't know that.

DEFENDANT MOSES: Okay.

Finally, the trial court attempted to clarify for Moses its role in the proceedings if Moses continued to assert his right to proceed *pro se*:

THE COURT: I want to make clear, on the record, my duty in these proceedings, Mr. Moses; and that is I cannot represent you.

DEFENDANT MOSES: Right.

THE COURT: By the same token, the Montana Supreme Court has said in these cases that I cannot permit you to commit some glaring error or permit some gross injustice to occur. But it's not my duty to represent you. My duty is simply, as I stated, to prevent some glaring error or injustice from occurring during the course of the trial due to the fact that you are proceeding pro se.

DEFENDANT MOSES: Okay.

THE COURT: So I can't assist you and you should not look to me for assistance; by the same token, I have a duty to prevent some gross injustice from occurring, and I will perform that duty to the best of my ability.

DEFENDANT MOSES: All right.

**¶31. Moses's prior experience with the legal system and the fact that he had already undergone one trial on the instant charge support the conclusion that Moses was aware of the dangers and disadvantages of self representation.**

**¶32. Moses also contends that his request to represent himself was far from unequivocal because he used phrases like "I guess" when responding to the court's questions. However, although Moses initially responded with such phrases, his later responses were far more assertive:**

THE COURT: Now, before we proceed to let you represent yourself, I want to inquire-- and I know I have inquired before--is this a voluntary waiver of your right to counsel.

DEFENDANT MOSES: Yes, sir, it is.

THE COURT: Has anyone coerced you or anyone else or threatened you or any members of your family, friends, whatever, to force you to do this?

DEFENDANT MOSES: No.

THE COURT: This is what you want to do?

DEFENDANT MOSES: Yes, sir, it is.

**¶33. Accordingly, we hold that substantial credible evidence exists to support the District Court's conclusion that Moses's waiver of his right to the assistance of counsel in his second trial was made knowingly, intelligently, voluntarily and unequivocally.**

## Issue 4.

*Whether the State's expert witness committed perjury when she testified that she had had no prior contact with the victim's family.*

**¶34. Moses claims that the State's expert witness, Lindsay Clodfelter, committed perjury when she testified that she had no personal contact with M.W. or her family when, in reality, the DFS file showed that Clodfelter had some contact with M.W.'s brother, A.V. The State argues that Moses's claim relies on factual information which is outside the record on appeal, therefore, it is not appropriate for review.**

**¶35. During the second trial, Moses objected to the State's first proposed expert witness because that expert had, at one time, counseled M.W. Moses objected because he felt that the expert might give testimony that was "colored" by her knowledge of the victim, but, because of the granting of the State's motion in limine regarding the DFS file, Moses would not be allowed to inquire regarding the reason for the "coloring." The court sustained Moses's objection and the State replaced its original proposed expert witness with Clodfelter.**

**¶36. At trial, Clodfelter testified that in preparation for her testimony, she reviewed the testimony of M.W., her mother, and her sister from the first trial, the police**

report prepared by the investigating officer, and the taped statements of M.W., her mother and her sister taken during the investigation. Clodfelter also testified that she had no personal contact with M.W. or her family. However, some of the documents from the DFS file indicate that Clodfelter had some contact with A.V., M.W.'s brother.

¶37. Moses contends that the State had a duty to correct Clodfelter's testimony, however, there is no evidence in the record that the State was aware that Clodfelter may have had contact with A.V. The materials Clodfelter reviewed in preparation for her testimony did not relate to A.V. Clodfelter could simply have forgotten that she had contact with A.V. previously or she simply did not make the connection that A.V. is M.W.'s brother.

¶38. There is no evidence that Clodfelter intentionally testified falsely. We agree with the State's contention that Moses's claim relies on factual information which is outside the record on appeal, i.e, the DFS file. Therefore, Moses's claim is not appropriate for review. *See* § 46-20-701, MCA; *State v. Black* (1990), 245 Mont. 39, 43, 798 P.2d 530, 532 (citation omitted).

¶39. Affirmed.

/S/ JAMES C. NELSON


We Concur:


/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART