No. 93-368

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

TERRY ALLEN LANGFORD,

Defendant and Appellant.

---

APPEAL FROM:    District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Appellate Defender, Helena,
Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General,
John Paulson, Ass't Attorney General,
Helena, Montana

Christopher Miller, Powell County Attorney,
Deer Lodge, Montana

---

FILED

OCT 04 1994

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:    August 18, 1994

Decided:    October 4, 1994

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Terry Allen Langford (Langford) appeals from a jury verdict in the District Court for the Third Judicial District, Powell County, convicting him of burglary and deliberate homicide. We affirm.

The following issues are presented on appeal:

1. Did the District Court violate Langford's right to represent himself at trial?

2. Did the District Court err by admitting evidence of a shooting incident which occurred when officers were retaking the maximum security unit of the Montana State Prison?

3. Did the District Court err when Judge Mizner refused to recuse himself?

4. Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the five inmate victims?

On the morning of September 22, 1991, nine maximum security inmates at the Montana State Prison gained control of the maximum security unit of the prison. These prisoners were able to release the other maximum security prisoners. When officers regained control of the building approximately five hours later, they discovered that five protective custody inmates had been killed in the riot, and others severely beaten.

The maximum security unit of the Montana State Prison is divided into six blocks with two central control cages. "A Block," "B Block," and "C Block" are located on the west side of the

2

building along with the main control cage which controls operations for A, B, and C Blocks. "D Block," "E Block," and "F Block" are located on the east side of the building along with the satellite control cage which controls operations for D, E, and F Blocks. Six exercise yards are located in the center of the maximum security unit between Blocks A, B, C and Blocks D, E, and F. At the time of the riot, there were 68 inmates in the maximum security unit. Ten protective custody inmates were located on D Block, and Langford was housed on B Block.

On the morning of September 22, 1991, thirteen inmates were using the exercise yards. Officers escorted three of these inmates from exercise yard five to C Block. Nine of the remaining inmates broke through the wire fences separating the exercise yards and entered yard five. From there, they ran through an open door into the west side of the maximum security unit. Once inside the building, the prisoners attacked the main control cage on the west side of the building. Approximately 45 minutes later, the inmates gained access to the satellite control cage on the east side of the building by burning a hole in the bulletproof glass. Once inside that cage, they obtained keys that opened the main control cage. The inmates then began opening cell doors and releasing other maximum security prisoners.

Some maximum security prisoners made their way onto D Block where they attacked the protective custody inmates. Five protective custody inmates were killed in the riot, and others were severely beaten.

The prison's Disturbance Control Team entered the maximum security unit and regained control of the unit at approximately 2 p.m. the same day. Officer Robert Geach (Geach), a member of the team, entered C and B Blocks while securing the unit. Geach testified that when he was on B Block he ordered the prisoners to strip and get on the ground as a precautionary measure against hidden weapons. Geach testified that Langford neither stripped nor went to the ground when commanded to do so. According to Geach, Langford made a move towards him and Geach then fired a warning shot into the door next to Langford. After the shot, Langford complied with Geach's commands.

On February 3, 1992, Langford was charged by information with one count of burglary in violation of § 45-6-204, MCA; and five counts of deliberate homicide in violation of § 45-5-102(1)(b), MCA.

In pre-trial motions, Langford moved the court for new counsel. Instead, the court appointed co-counsel. Langford later requested that he be allowed to represent himself. The court denied this request. Langford also made a motion in limine to exclude any evidence of the shooting incident, and moved the court for a substitute judge. The court denied these motions.

Following a jury trial, Langford was convicted of burglary and one count of deliberate homicide. He was sentenced to 20 years in prison on the count of burglary and life imprisonment on the count of deliberate homicide. The sentences were to run concurrently to each other and consecutively to the sentences Langford was already

4

serving.

I

Did the District Court violate Langford's right to represent himself?

At a pre-trial hearing held November 12, 1992, Langford informed the court that he wished to "fire" his appointed counsel, and represent himself. He also informed the court that he was seeking out-of-state counsel to represent him. The court did not allow Langford to represent himself, and continued the representation of Langford's two court appointed attorneys. Langford asserts that the court violated his right to represent himself.

The right to assistance of counsel is embodied in the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution. The Sixth Amendment has been interpreted to include a defendant's right to represent himself. Faretta v. California (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. This Court has interpreted Article II, Section 24 of the Montana Constitution to provide the right of the defendant to proceed pro se. State v. Colt (1992), 255 Mont. 399, 403, 843 P.2d 747, 749.

Under Montana statute, a defendant may waive the right to counsel when the court ascertains that the waiver is made knowingly, voluntarily, and intelligently. Section 46-8-102, MCA (1991). The Ninth Circuit Court of Appeals utilizes the additional requirement that the request to represent oneself must be

5

unequivocal. United States v. Robinson (9th Cir. 1990), 913 F.2d 712, 714. In the recent Colt case, we discussed the additional criterion of an unequivocal request but did not specifically adopt it. Colt, 843 P.2d at 751. We do so today.

First, Langford argues that, contrary to the requirements of Faretta, the District Court did not conduct a proper substantive inquiry of the defendant to satisfy itself that the defendant was in fact knowingly and intelligently foregoing the benefits of counsel. We disagree.

Faretta does not mandate any particular sort of questioning or inquiry, so long as the trial court satisfies itself that the defendant is "aware of the dangers and disadvantages of self-representation, so that . . . 'he knows what he is doing and his choice is made with eyes open.'" Faretta, 422 U.S. at 835. Similarly, we stated in Colt that we do not require district courts to rigidly adhere to a set of requirements in ascertaining whether a criminal defendant has made a knowing and intelligent waiver of his right to counsel. Colt, 843 P.2d at 751. We also stated that:

> [i]t is the district court judges who consider, assimilate, and absorb the nuances of each individual case. They are not constrained, as we are, to garnering all of their information from a cold record. . . . So long as substantial credible [evidence] exists to support the decision of the District Court . . . it will not be disturbed on appeal.

Colt, 843 P.2d at 752; citing State v. Plouffe (1982), 198 Mont. 379, 386, 646 P.2d 533, 536.

While there is no question that the trial court must, on the record, ensure that the defendant is voluntarily and intelligently

6

exercising his free will in choosing to represent himself, we hold that the record in this case supports our conclusion that the District Court properly determined in its various colloquies with Langford that his waiver was not voluntary, intelligent, and knowing; and that he was not competent to represent himself.

Next, we hold that Langford's request was equivocal. In discussing the requirement that the waiver of the right to assistance of counsel must be unequivocal, the Ninth Circuit stated that:

> The requirement that a request for self-representation be unequivocal also serves an institutional purpose: It prevents a defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation. A defendant who vacillates at trial between wishing to be represented by counsel and wishing to represent himself could place the trial court in a difficult position: If the court appoints counsel, the defendant could, on appeal, rely on his intermittent requests for self-representation in arguing that he had been denied the right to represent himself; if the court permits self-representation the defendant could claim he had been denied the right to counsel. See Meeks [v. Craven (9th Cir. 1973)], 482 F.2d [465] at 468. The requirement of unequivocality resolves this dilemma by forcing the defendant to make an explicit choice. If he equivocates, he is presumed to have requested the assistance of counsel.

Adams v. Carroll (9th Cir. 1989), 875 F.2d 1441, 1444. A defendant who vacillates in pre-trial proceedings places the trial court in the same difficult position as does a defendant who vacillates at trial.

In the present case, during a pre-trial hearing held on November 12, 1992, Langford made the following statement to the court:

Well, I'm aware of the statute . . . where it says you

7

can let me make a waiver of counsel if I make a . . . knowing and a competent and intelligent decision. Well, clearly I know what I'm doing, I'm waiving my right to counsel. As far as competent, I think that's covered under do I know what I'm doing, and it could be argued whether it was an intelligent decision or not, I'm sure. But as far as I'm concerned, my butt is the one that's on the line.

Standing alone, Langford's request appears to be unequivocal. However, upon reviewing the record as a whole, it becomes apparent that the request was equivocal.

Langford's attorney, Lawrence Murphy, first made a motion to withdraw on May 19, 1992. Mr. Murphy attached a letter from Langford to the motion which expressed Langford's dissatisfaction and his desire to retain an attorney who would, in his mind, better represent him. In the letter Langford does not express the desire to represent himself. On June 22, 1992, Mr. Murphy withdrew his motion to withdraw as counsel stating that after a lengthy meeting with Langford, Langford had requested to retain him. On October 1, 1992, Langford filed a pro se motion requesting that he be represented by different counsel. Nowhere in the motion does Langford request to represent himself. On October 14, 1992, Langford filed another pro se motion requesting that he be represented by replacement counsel at a pre-trial hearing scheduled for October 15, 1992. Nowhere in this motion does Langford request to represent himself. In fact, the motion states in part:

10. The Defendant does not feel that he can remotely represent himself at such a hearing.

11. The Defendant is a [sic] isolated-out-of-sight-out-of-mind-inmate [sic] who could not possibly make any type of legal arguement [sic] or argue any legal points that the State or Judge or Councel [sic] will undoubtedly

8

bring up.

12. The Defendant is unaware of at least 2/3rds of his rights and needs someone to represent him at this hearing who will protect those rights.

13. A person, in this case the Defendant, going up against such opposing forces and being uneducated in the law can not [sic] make any type of knowing or intelligent decisions or waivers that he will be forced to do at such a hearing.

At the pre-trial hearing held October 15, 1992, the court ordered that Mr. Murphy continue as counsel and appointed Edmund Sheehy, Jr. as co-counsel for Langford. Based on Langford's statement that he had no objection to the new arrangement, the court denied Langford's motion for new counsel. Finally, at the November 12, 1992 pre-trial hearing, after Langford stated that he wished to "fire" his appointed counsel and waive his right to counsel, he informed the court that he was continuing to seek the services of other counsel.

Taken as a whole, the record clearly reflects the fact that Langford's request to represent himself was equivocal. It is presumed that a defendant who equivocates has requested assistance of counsel. Carroll, 875 P.2d at 1444. Thus we hold that the District Court did not deny Langford the right to represent himself.

II

Did the District Court err by admitting evidence of a shooting incident which occurred when officers were retaking the maximum security unit of the Montana State Prison?

Langford filed a motion in limine to exclude any mention of

9

Officer Geach firing a warning shot near Langford when Geach, along with other officers, was in the process of retaking the maximum security unit. The District Court denied the motion.

Langford argues that the court erred in allowing the evidence of the shooting incident because it was irrelevant, constituted inadmissible character evidence, and was unduly prejudicial. The State asserts that the evidence was admissible as part of the corpus delicti.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid. Here, the burglary was charged based on the allegation that Langford had "knowingly entered or remained unlawfully in an occupied structure, the D Block area of the maximum security unit, with the purpose to commit an offense therein, namely, Riot." Riot is defined by statute as follows:

> A person commits the offense of riot if he purposely and knowingly disturbs the peace by engaging in an act of violence or threat to commit an act of violence as part of an assemblage of five or more persons, which act or threat presents a clear and present danger of or results in damage to property or injury to persons.

Section 45-8-103(1), MCA (1991). Taken in the context of officers retaking the maximum security unit following a violent riot, Langford's defiance of an officer's order tended to show his willingness to disturb the peace and participate in the riot. Thus, evidence of the shooting incident was relevant as it tended to make a fact of consequence more or less probable.

10

Next, Langford argues that evidence of the shooting incident should not have been allowed as it was character evidence of other bad acts. Generally, evidence of other crimes, wrongs or acts is inadmissible to prove the character of the person in order to show that he acted in conformity with that conduct; but such evidence may be admissible for other purposes. See Rule 404(b), M.R.Evid. This Court has recognized that, as an exception to the "other crimes" rule, the State may present the entire corpus delicti of the charged offenses including matters closely related to the offense and explanatory of it. State v. Hage (1993), 258 Mont. 498, 506, 853 P.2d 1251, 1256; citing State v. Riley (1982), 199 Mont. 413, 426, 649 P.2d 1273, 1279.

In Hage, evidence was allowed that several hours before he killed the victim, the defendant had threatened to kill someone other than the victim and was waving a gun around. Hage, 853 P.2d at 1256. This Court upheld the admission of that evidence because it was relevant to the defendant's state of mind and actions at the time he committed the homicide. Hage, 853 P.2d at 1256.

Hage is applicable to the present case. Here, Officer Geach testified that Langford disobeyed his command to strip and go to the ground and that Langford made a move towards him. Officer Patrick Huber of the disturbance control team testified that Langford had a defiant look when these actions took place. This evidence goes to Langford's state of mind at the time that the riot was taking place. The evidence of the shooting incident was admissible as it was closely related to the underlying offenses and

11

explanatory of them.

Finally, Langford argues that the evidence of the shooting incident was unduly prejudicial. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. See Rule 403, M.R.Evid. Whether the probative value is outweighed by the prejudicial effect is within the trial court's discretion; and the ruling of the trial court will not be disturbed unless there is a manifest abuse of discretion. State v. Scott (1993), 257 Mont. 454, 462-63, 850 P.2d 286, 291.

The evidence of the shooting incident is relevant to demonstrate Langford's state of mind during the riot. Langford fails to demonstrate how the evidence is substantially more prejudicial than it is probative. We hold that the District Court did not abuse its discretion in admitting the evidence.

III

Did the District Court err when Judge Mizner refused to recuse himself?

On November 12, 1992, Langford moved to have Judge Mizner recuse himself arguing that Judge Mizner had presided over four other cases arising from the prison riot, and that he had previously sentenced Langford to death in an unrelated case. Judge Mizner denied the motion.

A Montana statute provides that a party is entitled to one substitution of a district judge. Section 3-1-804, MCA (1991). However, the right to move for a substitute judge is deemed waived if no such motion is made before a judge has been assigned to the

12

cause for ten days after an information has been filed. Section 3-1-804, MCA (1991). Montana statute also provides that if a party files an affidavit alleging facts showing personal bias of the presiding judge, the judge may proceed no further in the cause. Section 3-1-805, MCA (1991). However, such an affidavit must be filed more than 30 days before the date set for hearing or trial. Section 3-1-805, MCA (1991).

Trial in this matter initially was set for August 3, 1992. After several continuances, the case went to trial on November 24, 1992. Langford moved the court to have Judge Mizner remove himself on November 12, 1992. Langford concedes that his motion was not timely filed under the above-listed statutes. He contends that the timeliness of his motion is not fatal in this case because this Court has held that where a trial judge is to be the trier of fact and participates in pre-trial negotiations which subsequently fail, the trial judge should, upon request, step down. Shields v. Thunem (1986), 220 Mont. 449, 452, 716 P.2d 217, 219.

In Shields, on the day of the trial, the judge acted as an arbitrator and mediator of the parties' dispute by placing the parties in separate rooms; taking offers and counter offers to the parties; and hearing some of the respective arguments of the parties ex parte. Shields, 716 P.2d at 217-18. In that situation, we held that the judge should have recused himself because of his extensive involvement in pre-trial negotiations. Shields, 716 P.2d at 219. Here, there is no indication of such involvement in pre-trial negotiations on the part of the court; nor was the court the

13

trier of fact. Thus, our ruling in Shields is inapplicable.

In addition, Langford urges us to adopt the position, taken by the Arizona Supreme Court in State v. Vickers (Ariz. 1984), 675 P.2d 710. The Vickers court recognized that it had held that a judge need not disqualify himself even though he had knowledge of prior bad acts if the acts ordinarily would come to light in a presentence report. Vickers, 675 P.2d at 712. However, the Vickers court then held that an appearance of impropriety was created when a judge who had passed a capital sentence on a defendant in an unrelated case presided over the same defendant's subsequent case, in which a capital sentence was a possibility. Vickers, 675 P.2d at 712. We decline to adopt Vickers.

We conclude that it does not create a per se appearance of impropriety for a trial judge to preside over a potential capital case involving the same defendant the judge had previously sentenced to death in an unrelated case. Nothing in the record before us indicates that Judge Mizner was prejudiced against Langford. We hold that the court did not err by denying Langford's motion for recusal.

IV

Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the five inmate victims?

During the trial, the State introduced several autopsy photographs of the homicide victims. Dr. Gary Dale, a pathologist, used the photographs during his testimony to explain the causes of death. Langford contends that the photographs' probative value was

14

that it had not allowed them access to the photographs during deliberations because it felt that if they had viewed them in the jury room, the photos would have been unduly prejudicial.

15

Langford's arguments have no merit.

In another case rising out of the same prison riot, when discussing the trial court's ruling regarding autopsy photos and undue prejudice, we noted that it was most important that the court had not allowed the photographs into the jury room. State v. Cox (Mont. 1994), ___ P.3d ___, ___, 51 St.Rep. 680, 685. We hold that the District Court used sound discretion in allowing the probative photographs into evidence, and then determining that there was a greater chance of prejudice had the photographs gone to the jury room. We will not disturb the District Court's ruling, as there was not a manifest abuse of discretion in admitting the photographs into evidence.

The judgment of the District Court is affirmed.

_John Conway Harrison_
Justice

We concur:

_J. A. Turnage_
Chief Justice

Justices

Justice Karla M. Gray, specially concurring.

I concur in the Court's opinion except as to issue 2. I specially concur with regard to that issue, agreeing with the result reached by the Court but not with all that is said in reaching that result.

Specifically, I am unconvinced that the shooting incident which occurred when officers were in the process of retaking the maximum security unit was relevant to any "fact that is of consequence to the determination of the action" under Rule 401, M.R.Evid. Nor am I convinced that the shooting incident, which occurred after the offenses with which Langford was charged had been committed, falls within the corpus delicti of those offenses.

Nonetheless, in the context of the overall evidence of Langford's acts in participating in the riot, I conclude that admission of the evidence was error concerning which Langford did not establish any prejudice. Thus, it is my view that admission of the shooting incident evidence was harmless error by the District Court, not reversible by this Court.

_____
Justice

17

October 4, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

William F. Hooks
Appellate Defender
Capitol Station, P. O. Box 200145
Helena, MT 59620-0145

Hon. Joseph P. Mazurek, Attorney General
John Paulson, Assistant
Justice Bldg.
Helena, MT 59620

Christopher Miller
County Attorney
Powell County Courthouse
Deer Lodge, MT 59722

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy