No. 03-577

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 69

_____

STATE OF MONTANA,                          )
                                           )
          Plaintiff and Respondent,        )
                                           )       O P I N I O N
     v.                                    )       A N D
                                           )       O R D E R
DAVID THOMAS DAWSON,                       )
                                           )
          Defendant and Appellant.         )

_____

¶1     Defendant and Appellant, David Thomas Dawson, has moved to discharge his appellate counsel, dismiss all ongoing appeals, and proceed to the execution of his sentence of death.  This Court concludes that Dawson's motions are made knowingly, voluntarily, and intelligently; and must be granted.

¶2     In February 1987, Dawson was found guilty, by jury verdict, of three counts of deliberate homicide, four counts of aggravated kidnapping, and one count of robbery.  Dawson's sentence was determined by the District Court, without jury findings of aggravated circumstances, pursuant to §§ 46-18-301 to 305, MCA (1985).  Dawson was sentenced to death for each count of deliberate homicide.  He was also sentenced to death for the aggravated kidnappings of the deliberate homicide victims.  For the aggravated kidnapping of the surviving victim, Dawson was sentenced to one hundred years imprisonment.  An additional ten years imprisonment was added for use of a dangerous weapon.

¶3 The trial court found the existence beyond a reasonable doubt of four aggravating circumstances: (1) the offenses were aggravated kidnappings that resulted in the deaths of the victims; (2) the deliberate homicides were committed as part of a scheme or operation which, if completed, would result in the death of more than one person; (3) the deliberate homicides were committed by a person lying in wait or ambush; and (4) the deliberate homicides were committed by means of torture. The trial court also found "as a matter law that each aggravating circumstance, standing by itself, is sufficient for the imposition of the death penalty."

¶4 On August 23, 1988, this Court unanimously affirmed Dawson's convictions and death sentences on direct appeal, and the United States Supreme Court denied Dawson's petition for writ of certiorari. *State v. Dawson*, 233 Mont. 345, 761 P.2d 352, *cert. denied* 491 U.S. 910 (1989).

¶5 In July 2002, Dawson filed, through counsel, a Motion for New Trial in the Thirteenth Judicial District Court, Yellowstone County. He challenged his death sentences under the ruling in *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. In September 2002, again through counsel, Dawson filed a Motion to Vacate a previous order in which the District Court had denied a challenge to his sentence of death under *Ring*. In July 2003, the District Court denied both motions. On July 24, 2003, Dawson appealed to this Court.

¶6 On August 24, 2004, Dawson, acting *pro se*, filed motions in this Court to dismiss all ongoing appeals and discharge his appellate counsel, William Hooks and Kathryn Ross (Hooks and Ross). He also moved the District Court to set a new date for his

2

execution. Hooks and Ross resisted these *pro se* motions. This Court, by Order of July 26, 2005, remanded the motions to the District Court with instructions to determine whether they were made knowingly, voluntarily, and intelligently.

¶7 Dawson had also filed a petition for habeas corpus challenging his death sentences in the United States District Court for the District of Montana, Billings Division. At about the same time that Dawson filed his motions in this Court to discharge his counsel and dismiss all appeals, he filed a similar motion in the U.S. District Court to dismiss his habeas corpus petition.

¶8 The U.S. District Court appointed Dr. Sally C. Johnson, M.D., and Dr. James H. Hilkey, Ph.D., to conduct psychiatric evaluations of Dawson. Both Dr. Johnson and Dr. Hilkey conducted thorough evaluations of Dawson and produced written reports which concluded that he was not suffering from any mental disease, disorder, or defect that would affect his capacity to appreciate his position and to make rational decisions.

¶9 U.S. Magistrate Judge Richard Anderson reviewed the reports from Drs. Johnson and Hilkey and took evidence from Dawson. The Magistrate Judge recommended that Dawson's motion to dismiss his habeas petition be granted. Senior U.S. District Judge Jack D. Shanstrom accepted this recommendation, and on December 12, 2005, entered an order granting Dawson's *pro se* motions to withdraw his federal habeas petition and dismiss his court appointed attorneys. The U.S District Court concluded that Dawson's decision was the product of "rational intellect and an unconstrained will and that he is well aware of the consequences of this decision." This order is now on appeal.

¶10    In response to this Court's remand, the Yellowstone County District Court obtained and reviewed the reports submitted to the U.S. District Court by Drs. Johnson and Hilkey.  The District Court was also familiar with the entirety of Dawson's file.  The District Court conducted a hearing at which Dawson appeared and was questioned on the record by the court and by counsel.

¶11    The District Court, by Order dated February 6, 2006, concluded that Dawson suffers from no mental disease or defect and his motions were made knowingly, voluntarily, and intelligently.  The record was then returned to this Court for a decision on Dawson's motions to discharge his appellate counsel and dismiss this appeal.

¶12    On March 29, 2006, Hooks and Ross filed a motion for leave to file a supplemental brief.  In this motion they argue that this Court should first resolve the question of whether *Ring* is retroactive under Montana law, notwithstanding the U.S. Supreme Court's decision in *Schriro vs. Summerlin* (2004), 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442, before determining whether Dawson's motions to discharge his lawyers and to dismiss this appeal are made knowingly, voluntarily, and intelligently. The State and Dawson each filed separate responses in opposition to this motion.

### *The Right to Waive Counsel*

¶13    The Sixth Amendment to the United States Constitution and Article II, § 24 of the Montana Constitution guarantee an accused the right to the assistance of counsel. However, this right does not prohibit a defendant from rejecting the assistance of counsel. *State v. Weaver* (1996), 276 Mont. 505, 511, 917 P.2d 437, 441.  A person charged with a crime has the constitutional right to proceed *pro se*. *State v. Woods* (1997), 283 Mont.

4

359, 372-373, 942 P.2d 88, 97. This Court has stated that before a court may grant a request for self-representation, it must first determine that the defendant's waiver of the right to counsel is unequivocal, as well as voluntary, knowing, and intelligent. *State v. Langford* (1994), 267 Mont. 95, 99, 882 P.2d 490, 492.

¶14 We do not rigidly adhere to a specific set of requirements in ascertaining whether a criminal defendant has made a knowing and intelligent waiver of his right to counsel. *Langford*, 267 Mont. at 99, 882 P.2d at 492. There is no particular questioning or inquiry required, so long as the trial court satisfies itself that the defendant is "aware of the dangers and disadvantages of self-representation, so that . . . 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California* (1975), 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 582 (quoting *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275). This test focuses not on what a defendant was told, but on a determination that a defendant understands his decision and is proceeding voluntarily. *State v. Insua*, 2004 MT 14, ¶ 20, 319 Mont. 254, ¶ 20, 84 P.3d 11, ¶ 20.

¶15 As discussed above, this Court remanded Dawson's motions to the District Court to make an initial factual determination of whether he was acting voluntarily, knowingly, and intelligently. So long as substantial credible evidence exists to support the determination of the district court, it will not be disturbed. *Langford*, 267 Mont. at 100, 882 P.2d at 492.

¶16 As we discuss below in considering the motion to dismiss this appeal, two mental health professionals thoroughly examined Dawson and concluded that he does not suffer

from any mental disease or defect and that he is acting voluntarily. The District Court also, after a thorough examination of Dawson, determined that his desire to dismiss his lawyers and proceed *pro se*, was made knowingly. Dawson himself clearly and cogently explained to the District Court why he wished to dismiss counsel and withdraw his appeals:

> MR. DAWSON: To start with, Your Honor, the reasons why--I mean there's a multitude of reasons why. It is years--a decision that has been years in the making. It's a case that would be 20 years old here in just a few months. Right now there's no end in sight. I guess, without spending hours and hours explaining personal reasons why, it comes down to just enough's enough. It's just time.
>
> And as to my lawyers, the fact of the matter is, they're not with me on this in any sense. They have their own agenda, and they've demonstrated very willing [sic] just to show that their agenda is not mine. I think they should be dismissed because they have their welfare in mind and not so much my welfare.
>
> THE COURT: Well, your welfare means life, and your decision means death for you; agreed?
>
> MR. DAWSON: Well, I agree fully. But it's my decision and not theirs. How I determine my decision shouldn't have any bearing on what my lawyers feel is right or wrong.
>
> THE COURT: Okay. Let me ask you a few follow-up questions[.] . . . [Y]ou said your attorneys lack any standing to make any request or make objections. Why is that[?] . . .
>
> MR. DAWSON: Well, I --
>
> THE COURT: Go ahead.
>
> MR. DAWSON: I'm not a lawyer. I have no formal education in the legal field. It's just my belief that a defense attorney should be willing to defend a client up to a point where that client doesn't need them or want them anymore. I didn't feel that my attorneys have a right, legal standing to continue to do something against my wishes.

THE COURT: Well, what about the analogy of a doctor wanting to and actually being required to do everything possible to cure, to heal or to try to save a person's life? Would you follow the same analogy?

MR. DAWSON: Well, I have no problem with that, Your, Honor.

THE COURT: Pardon?

MR. DAWSON: To a degree, Your Honor, I have no problem with that. But the difference in that is a patient has a right to go to another doctor. What my lawyers are trying to take away from me is my right to do something that is legal under the law, and that is to defend myself without their presence, to come up with a decision to stop my appeals, no matter what they think or feel. I feel I have a legal right to do so. And since they feel that I shouldn't be doing this, it's basically they're saying I don't have a right to do this.

THE COURT: You say . . . you find yourself now at odds with your attorneys. . . . Do you have any objection to the quality of their work or their sincerity of their beliefs?

MR. DAWSON: Not up to a year and a half ago, no.

. . . .

MR. DAWSON: When I decided to give up my appeals, I let them know beforehand and asked them if they would help me. Because if they wouldn't, then I asked them if they wouldn't hinder me. Unfortunately, they've done nothing but hinder my decision, which I really have no problem with, I just don't like the deceptions that they've used to get to their point.

THE COURT: You talk about the case has been reduced to the attorneys' false sense of need to win the case no matter what the cost, including going against the express--or your express wishes. So what do you mean by that?

MR. DAWSON: That's correct. They understand my desires in this case. They understand how I'm trying to proceed to stop my appeals, and yet they're coming up with legal arguments to try to slow things down in court. I'm not saying they don't have a right to do this, but at some point ethics should come into line. And if a lawyer doesn't agree with a client, then they should step aside, and they refuse to do so. I have asked them several

7

times to step aside. They refuse to do so and continue fighting legally against my legal rights to stop my appeals.

. . . .

THE COURT: . . . [Y]ou are aware of the dangers of representing yourself, and you are willing to waive your right to have your attorneys and in fact dismiss them?

MR. DAWSON: I'm fully aware of all aspects of that, Your Honor.

THE COURT: So you know that--you know, you've admitted you're not trained in the law, you're not fluent in, and I--you probably have a lot less access than any of us have to legal research and decisions, and both from a substantive standpoint as well as a procedural standpoint. And you're willing –

MR. DAWSON: I understand that, Your Honor.

THE COURT: . . . [Y]ou know, one of the first things I was taught, and probably all the lawyers here in the courtroom were taught, that a lawyer who represents himself or herself has a fool for a client.

MR. DAWSON: (Nods head.)

THE COURT: And in spite of that, are you--you're willing to, and, in fact, affirmatively want to dismiss your attorneys; is that right?

MR. DAWSON: Yes, Your Honor.

¶17 Dawson's remarks to the District Court were articulate, consistent and evince that he is acting knowingly and intelligently. We also conclude that Dawson's motions were made voluntarily and we will discuss this further in the subsequent section of this Opinion.

¶18 There is no doubt that Dawson's decision to dismiss counsel is final and unequivocal. *Cf., Langford*, 267 Mont. at 101-102, 882 P.2d at 494 (where defendant wished to "fire" his appointed counsel and waive his right to counsel, but also informed

8

the court that he was continuing to seek the services of other counsel, his request to represent himself was not unequivocal). The District Court questioned Dawson specifically regarding this matter:

THE COURT: . . . I just want to make sure, although I think you've said this in a number of ways, is that, is this decision of yours unequivocal? In other words, do you got [sic] any hesitation of what you're doing here today, any doubts about dropping your appeal or firing your attorneys?

MR. DAWSON: None at all, Your Honor. Like I said earlier, I spent years coming to this decision. I spent, you know, I can't tell you how much time playing the devil's advocate with myself, you know, looking at the pros and cons of what my decision might lead up to and how I reach that decision. So, no, at this time I'm perfectly comfortable with this decision.

THE COURT: Well, this is the time to make the decision, you know, but I'm going to making [sic] my decision based on what you say today. So if after we sign off here in a little while, or tomorrow or the next day, you say, yee, [sic] I've got that nagging feeling or I've got second thoughts[;] that may be too late.

MR. DAWSON: I don't see that happening, Your Honor. I've been proceeding with this for over a year and a half now. If anything, my resolve on this is even stronger than what it was a year and a half ago.

THE COURT: Why is that?

MR. DAWSON: Well, it's just--to reach the decision, no matter how tough that decision is, it's sometimes time can just reinforce it. And I've had nothing but reinforcement, you know, ideas on it since I came out with that decision. It's something that I just feel is right for me. This is something that I should do.

THE COURT: Well, are you aware that this is a very final decision? This is obviously, you know, literally life and death?

MR. DAWSON: (Nods head.)

. . . .

THE COURT: Okay. And then are you totally at peace with yourself about

9

your decision to drop the appeals and to fire your attorney?

MR. DAWSON: I'm more at peace with myself, Your Honor, than I've been in years.

Dawson's motion to dismiss his counsel is well taken.

### *Capacity to Withdraw Appeals*

¶19　This Court has not yet articulated a standard that should be used in deciding whether a person under a sentence of death has the required mental competence to waive his right to further judicial review. The U.S. Supreme Court announced its standard in *Rees v. Payton* (1966), 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583. The federal test is whether the defendant "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314, 86 S.Ct. at 1506, 16 L.Ed.2d at 584-585. This standard comports with Article II, §§ 4 and 10, of the Montana Constitution, is understandable, and we shall utilize it in making the determination required.

¶20　Under the applicable standard, a defendant is competent if he is not suffering from a mental disease or defect. *Rumbaugh v. Procunier* (5th Cir. 1985), 753 F.2d 395, 398. Conversely, if the defendant does suffer from some mental disease the court must then determine if that disease or defect prevents him from understanding his legal position and the options available to him, or whether the mental defect would prevent him from making a rational choice among his options. *Rumbaugh*, 753 F.2d at 398. If the defendant cannot understand his legal position or otherwise make a rational choice

10

among his options then he is incompetent. *Rumbaugh*, 753 F.2d at 398.

¶21 The Ninth Circuit followed *Rees* in *Dennis v. Budge* (9th Cir. 2004), 378 F.3d 880, 889. In *Dennis*, the defendant had a history of various mental illnesses and suicide attempts, yet the court held he was still competent to decide for himself whether to forgo further judicial review. *Dennis*, 378 F.3d at 892. The state district court appointed a psychiatrist who examined Dennis, reviewed his records, interviewed counsel, and prepared a report for the court. *Dennis*, 378 F.3d at 893. The state district court had also conducted a hearing at which Dennis was present. *Dennis*, 378 F.3d at 884. The psychiatrist did not testify at the hearing, however, the court did engage in a colloquy with Dennis. *Dennis*, 378 F.3d at 884.

¶22 Based on the psychiatric report and its colloquy with Dennis the state district court found that he had not been suicidal since his incarceration and did not suffer from any disease or mental defect that prevented him from making a rational choice among his various legal options. *Dennis*, 378 F.3d at 891-892. Dennis's appellate counsel then filed a petition for writ of habeas corpus with the U.S. District Court, which was denied. *Dennis*, 37 F.3d 882. The Ninth Circuit affirmed the denial and relied upon the findings of the state district court to conclude Dennis's withdrawal of his appeal was competent. *Dennis*, 378 F.3d at 892 (quoting *Demosthenes v. Baal* (1990), 495 U.S. 731, 735, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762, 768 (a state court's findings regarding competency are entitled to a presumption of correctness and a federal court may not overturn such findings unless they are not "fairly supported by the record.")).

11

¶23 In the present case, Hooks and Ross have made no challenge to the qualifications of Drs. Hilkey and Johnson. Dr. Hilkey examined Dawson and produced a ten-page psychological evaluation dated May 3, 2005. Dr. Johnson produced a forty-page forensic psychiatric evaluation dated May 13, 2005. Dr. Johnson interviewed Dawson twice at the Montana State Prison. She also interviewed Dawson's attorneys, his mother, and a long-time friend. In addition, she reviewed significant documentation regarding the circumstances of Dawson's confinement at the Montana State Prison. Both Dr. Johnson and Dr. Hilkey concluded that Dawson was not suffering from any mental disease, disorder, or defect that would affect his capacity to appreciate his position and to make rational decisions.

¶24 In her report, Dr. Johnson notes that during the evaluation Dawson was cooperative, demonstrated a "full and clear understanding" of the process, and was a "reliable historian in regard to the issues at hand." Dr. Hilkey made similar observations and determined that Dawson's intellectual functioning is superior.

¶25 Other than evaluations related to the offenses for which Dawson was sentenced to death, he has no significant psychiatric history. Throughout the last eighteen years of his incarceration, Dawson has not sought any mental health care or been identified by prison staff as in need of any mental health intervention. In addition, he has no significant behavioral problems. Dr. Johnson's interviews with Dawson's attorneys, mother, and a long-time friend revealed that no one ever viewed Dawson as suffering from significant mental illness.

¶26    Dr. Johnson observed no abnormalities in Dawson's thought process.    His responses were direct and relevant, and there was no evidence of any obsessive thinking, compulsive behavior, suicidal ideation, delusional beliefs, or clouding of consciousness. Dawson denied feeling depressed or having any significant periods of depression in the past, and his responses to structured clinical interviewing revealed no indications of a psychiatric diagnosis other than past substance-abuse problems.    In addition, psychological testing revealed no basis for a specific personality disorder diagnosis. Based on this testing, Dr. Hilkey concluded that no cognitive or emotional factors compromised Dawson's ability to make a rational and informed decision about his future.

¶27    Our review of the medical reports, like that of the District Court, shows that Dawson suffers from no mental disease or defect that would affect his ability to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation.    Dr. Johnson stated that clinical evaluation, review of extensive collateral material, and psychological testing revealed no evidence of mental illness, psychosis, significant mood disorder or organicity, either presently or historically. She concluded that Dawson clearly appreciates his current position and has demonstrated an ability to make rational decisions on a daily basis within his environment.    In addition, Dr. Johnson concluded that Dawson is able to clearly articulate the bases for his decision despite being aware that others may not view the decision as rational.

¶28    As discussed above, the District Court conducted a hearing at which Dawson was questioned.    Although given the option to appear personally, Dawson appeared before the District Court by video conferencing from the Montana State Prison in Deer Lodge.

Present with him was stand-by counsel, Edmund Sheehy, who had been appointed by the District Court. Hooks was present in court, while Ross was present by telephone. Attorneys for the State of Montana appeared in court. Both the District Court and counsel asked questions of Dawson.

¶29 In our order remanding Dawson's motions, we ordered the District Court to gather such information and conduct such proceedings as were necessary and lawful to make the required determinations. A district court has a measure of discretion in affording a hearing that is suitable under the circumstances. *Dennis*, 378 F.3d at 894 (citing *Rees*, 384 U.S. at 314, 86 S.Ct. at 1505, 16 L.Ed. at 585). Further, a district court judge who has an opportunity to observe and question a prisoner is not constrained by the cold record and is often in the best position to judge competency. *See Langford*, 267 Mont. at 100, 882 P.2d at 492; *Dennis*, 378 F.3d at 894 (citing *Baal*, 495 U.S. at 735-737, 110 S.Ct. 2225-2226, 109 L.Ed.2d 768-769 (explaining that the trial court had the opportunity to witness and question the prisoner and was thus in a better position than a court of appeals to determine competence because the court of appeals did not personally observe the prisoner)). We conclude that the procedure conducted by the District Court was appropriate and suitable under the circumstances.

¶30 The District Court found no indication that Dawson suffered from any mental disease or defect. The District Court, after observing Dawson, stated on the record:

> [t]here was never a moment in which Dawson was inappropriate in his actions or words . . . [he] exhibited no unusual behavior. Dawson was polite yet firm in his answers to the Court. His oral responses were articulate and consistent and he understood the reason for the hearing.

14

¶31    Dawson has no prior history of mental diseases. Further, it is clear from the transcript of the hearing that Dawson understands his legal options, as well as the consequences of those options:

> THE COURT: So if I grant your motions, what will happen in your mind? What do you see happening then in this case?
>
> MR. DAWSON: If you're referring to the motion to have an execution date, I think that I'm validated in what Judge Shanstrom came out with on Monday [U.S. District Court], that I have a legal right to do what I'm doing, and I would fully expect an execution date be set and then eventually carried out.
>
> THE COURT: I just want to make sure that you understand a few of the legal aspects here. That presently before the Montana Supreme Court is an appeal on your behalf by your attorneys. And there are at least issues regarding ineffective assistance, and there may be other issues. There is also the significant issue of the retroactivity of the *Ring* decision from the Montana –or from the U.S. Supreme Court. So from your documents, you've mentioned the *Ring* case; are you aware of that?
>
> MR. DAWSON: Well, I'm aware that it started out with *Apprendi*, and then came to *Ring*, and eventually led to *Semmerlin* [sic], yes, I am.
>
> . . . .
>
> THE COURT: Are you aware that even though the U.S. Supreme Court, through Justice Scalia, last year said that under United States law that *Ring* was not retroactive? In other words, that you were not entitled to a new sentencing hearing because the jury did not consider and make decisions on the--on this issue regarding aggravating and mitigating circumstances. Are you aware that even though the U.S Supreme Court said that, Montana Supreme Court can say something different, could disagree and say, yes, it is retroactive and, yes, there must be new sentencing?
>
> MR. DAWSON: Yes, I'm fully aware of that, Your Honor.
>
> THE COURT: And if there is a new sentencing, it's certainly possible that the sentence could be life in prison without parole. It could not--it could be something other than the death penalty. And so –

15

MR. DAWSON: But, then again, it could also be the death penalty.

THE COURT: That's true. But you will never know that decision if you give up your right to this appeal. And –

MR. DAWSON: Your Honor, when I first started talking about this, I mentioned it, this is a decision that's been years in the making. And I've looked at every factor that I possibly can. And I understand the possibilities of what the future might bring if I were to continue my appeals. That's part of the decision-making. And I have looked at everything as far as I'm aware of to come up with this decision. So I am aware of the current law, and I am aware that, very likely, I could get resentenced. But I don't know that for a fact, I don't know what the future would bring. But it is part of my decision-making. And at the same time, I have come up with the decision to stop my appeal.

. . . .

THE COURT: Well, what would you say to someone that said, can a rational person ever make that decision? That just by saying whether you want to die or you're ready to die and not fighting is automatically a person that has defective reasoning or is mentally deficient or they shouldn't be allowed to. How do you respond to that?

MR. DAWSON: Well, I think most people who come up with that kind of reasoning hasn't [sic] spent any time in prison. It's like the old saying, you know, walk a mile in someone's shoes. Well, do 20 years in my shoes and then talk to me about reasoning.

THE COURT: And I asked you previously about the possibility that the Montana Supreme Court could say that *Ring* was retroactive, you could get a new sentence and you could get a sentence that was not death. Aren't you telling –

MR. DAWSON: There is that possibility, Your Honor.

THE COURT: Well, aren't you telling me then that whether you're doing it yourself or you're having the State do it, you're killing yourself?

MR. DAWSON: I don't look at it quite that way, Your Honor. I'm just asking for my sentence to be carried out. I've had 20 years of this. In most states, I think the average for someone who has been sentenced to death is six, seven or eight years before they're executed. Like I said earlier, it's

16

been almost 20. There has to be an end to it. The lawyers enjoy the fact that the case keeps going on and on while I'm sitting here in prison with, kind of in limbo, per se. I have no hopes, no dreams. All I have is 20 years of preparing to be executed. And it's that preparedness that I decided, you know, enough's enough. You know, there has to be an end.

¶32 In addition, Dr. Johnson stated in her report that Dawson was:

clear in describing the appeals process has gone on much longer than he ever anticipated. At the beginning when his case was being appealed, he anticipated that within a period of less than 10 years his appeals would be exhausted. As time went on, he thought about discontinuing the appeal process and ultimately choosing a particular date to discontinue his appeals. He eventually felt he had worked through many issues and developed the courage to set such a date. The date he set as his decision making point was the Supreme Court's ruling on the *Summerlin* case [*Schriro v. Summerlin* (2004), 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442]. He is able to express a clear understanding of the parallel issue he currently has before the Montana Supreme Court. He understands that those proceedings are going on regardless of his request to discontinue his appeals at this time.

¶33 Dr. Johnson further noted that Dawson understands that if he was successful in setting aside his present sentences, he could be sentenced again to death and the appeals process would start anew. In that event, she said Dawson "clearly states he would not proceed with anything but the mandatory appeal[.]" Dr. Johnson believes that since his decision to end all appeals, Dawson feels that he at least has "some control in his life[,]" which is important to him.

¶34 Dr. Johnson's interview with Dawson's friend, Ann Sheridan, corroborated much of Dawson's sentiments. Sheridan, who has maintained almost daily correspondence with Dawson for the past ten years, does not believe his decision to discontinue his appeals has arisen out of depression or as a result of the suicides of other inmates. She and Dawson have discussed the issue at length, and she was surprised he waited as long

as he did to make the decision. Sheridan does not view Dawson as suicidal and observes that he has been at peace since deciding to forgo further review. She also believes he feels responsible and remorseful for the deaths of the victims, is ready to accept the punishment for his actions, and would prefer to be executed than spend the rest of his life in prison.

¶35 Given Dawson's testimony and the conclusions reached by the doctors appointed by the U.S. District Court, there is substantial creditable evidence to support the District Court's findings that Dawson appreciates his position and made a rational choice with respect to continuing or abandoning further litigation.

¶36 It is unnecessary to make a determination whether, under Montana law, *Ring* must be applied retroactively. Dawson has considered this matter thoroughly and it is his express wish and demand that this Court grant his motion to dismiss this appeal immediately. As Dawson is competent to make the decision to dismiss this appeal, and has done so knowingly, and as discussed below voluntarily, we do not deem it appropriate or necessary to continue this case against his wishes.[1]

¶37 In addition to the findings discussed above, to conclude that Dawson is competent to withdraw his appeals, we must also determine the separate question of whether his decision is voluntary. *Comer v. Stewart* (9th Cir. 2000), 215 F.3d 910, 917. A waiver is voluntary if the defendant is fully aware of the direct consequences, including the actual

[1] Hooks and Ross advise us there is currently a case under review in the Ninth Circuit Court of Appeals, *Comer v. Stewart*, 98-99003, where counsel represent the issue is: May a State execute a person whose conviction and sentence are constitutionally invalid when that person has validly waived his right to an appeal of his habeas corpus rights? The fact that the Ninth Circuit may be considering this question does not compel this Court to continue with this litigation.

value of any commitments made to him by the court, prosecutor, or his own counsel, and he was not induced by threats or promises to discontinue improper harassment, misrepresentation, or improper inducements. *See Duffy v. State*, 2005 MT 228, ¶¶ 13-15, 328 Mont. 369, ¶¶ 13-15, 120 P.3d 398, ¶¶ 13-15.

¶38    It may be possible for the conditions of imprisonment to render a defendant's decision involuntary. For the decision to be involuntary, the conditions must be shown to be so bad as to have the effect of causing one to "abandon his desire to live." *Comer*, 215 F.3d at 918. Dawson's appellate counsel, Hooks and Ross, assert that their client's conditions of confinement have extinguished his desire or will to live, thus rendering his apparent decision to withdraw this appeal involuntary. Specifically, Hooks and Ross claim that (1) two recent suicides by other Montana State Prison inmates have caused Dawson a great deal of stress, and (2) Dawson suffers from several health problems including Hepatitis C and leg and back pain, and may not be receiving proper care.

¶39    The District Court specifically questioned Dawson about these issues and any effect they may have had on his decision making:

> THE COURT: Is there any part of this decision on your part, is it due to any of your conditions there at the prison regarding your confinement, your --any rules, any aspects of how you're housed there and any limits that you have there?
>
> MR. DAWSON: Well, that's a tough question to answer, because conditions are a factor. However, the conditions here are tolerable. There are rights in a sense that I don't feel that they're a controlling factor in my decision. But if I wasn't locked up and under these conditions, I wouldn't be coming to these [sic] type of condition--or decision. So, yes, the conditions are a factor, but they're a small part of the fact--or the decision, I mean.

THE COURT: There's been references that some of your decision may have been triggered by the suicide of several people that were on death row in the last few years. Did that--did the suicide of either Mr. Turner or Mr. Sattler have any impact on your decision?

MR. DAWSON: None whatsoever, Your Honor.

THE COURT: Why not?

MR. DAWSON: Well, Turner and Sattler were grown men and they made a decision. It was a very private, personal decision on their part, and I felt that they did what they had to do for themselves and it didn't affect me in any sense.

THE COURT: Since you've been in Montana State Prison, have you ever attempted suicide?

MR. DAWSON: No I haven't.

THE COURT: Have you thought about it?

MR. DAWSON: Not particularly, no.

THE COURT: Were there any rule changes at the prison as a result of those suicides that had any impact on your decision here?

MR. DAWSON: None whatsoever, Your honor. . . .

THE COURT: Is any part of this decision due to your inability to have any mental health or psychological services that you may have wanted?

MR. DAWSON: To the best of my knowledge, those services are available to me whenever I want them.

THE COURT: Have you asked for any help through those services at the prison?

MR. DAWSON: No, I never have.

THE COURT: Why not?

MR. DAWSON: Never felt I needed them.

. . . .

THE COURT: How about your physical condition, does that have anything to do with your decision?

MR. DAWSON: It has parts to do with the decision. I have numerous health concerns.

. . . .

THE COURT: Well, do I hear you saying that part of the decision is, the execution would then obviously end those physical problems, and that would be a welcomed relief; is that what you're saying?

MR. DAWSON: To a degree, yes, Your Honor.

THE COURT: Does any part of this decision have anything to do with, you know, how you spend your time, your daily time, your activities or that? You describe to Dr. Johnson a typical day and items that you have in your cell and your television and whatnot. Is not having access to matters involving that have any impact on your decision?

MR. DAWSON: Like I stated earlier, Your Honor, I tried to look at everything before I came to this decision. Since it was such a serious decision, I tried to look at every factor I could possibly think of. My everyday life, my health, everything was part of my decision-making. For what I have in my cell for daily use is a lot more than you have in individual cells in other prisons. So I can't complain about what we have in our cells here, it actually isn't too bad.

THE COURT: How about the prison factors in general; is that a factor?

MR. DAWSON: Well, you know, it's hard for me to answer that in a general sense, because I can only testify about what I see in the max building. I have no contact with the population part of the prison. I do talk to people that have been sent to max from population.

. . . .

THE COURT: Is any part of this decision due to your inability to communicate with family or friends? Do you have the ability or have you had the ability to write or to call, to communicate with the outside world?

MR. DAWSON: I write approximately 30, 35 letters a month to friends and family. I've made several phone calls a month to friends and family. I was getting visits every week for a long time until the person that I was getting visits from moved out of state. So I'd have to say that I had very good contact and support from friends and family.

¶40 There is no evidence that Dawson has been denied any right while incarcerated at the Montana State Prison, and certainly no evidence of prison conditions that would cause Dawson to "abandon his desire to live." *See Comer*, 215 F.3d at 918. Dr. Johnson, like the District Court, concluded that the concerns of Hooks and Ross were unfounded. Based on her own observation of the operation of the prison unit as well as her review of the prison's policies and other collateral information, Dr. Johnson found no significant condition of confinement that has directly impacted negatively on Dawson. To the contrary, as evidenced by the testimony above, he claims that the conditions of his confinement are "tolerable."[2]

¶41 Hooks and Ross have not provided any substantial evidence that Dawson's motions were not voluntary. Speculation of possible coercion or duress is insufficient, especially as Dawson competently testified to the contrary:

MS. COLLINS [State attorney]: . . . Mr. Dawson . . . have you ever been coerced or threatened in any way in the bringing of your pro se motions?

MR. DAWSON: No, I haven't.

MS. COLLINS: And, finally, have you been promised anything in terms of bringing your pro se motions?

---

[2] *Cf., Comer v. Stewart* (9th Cir. 2000), 215 F.3d 910, 918. In *Comer*, unlike in this case, there was evidence that the defendant had no access to legal materials, was permitted nothing in his cell, and had to "walk continuously for fear of becoming a 'veggie.'" The Ninth Circuit remanded to the district court for further development of the record. *Comer*, 215 F.3d at 918.

MR. DAWSON: No, I haven't.

¶42 Hooks and Ross also argue that another hearing is required where they should have the opportunity to cross-examine Dr. Johnson. They contend that perhaps through such cross-examination they could expose some flaw in the medical reports or show some evidence of duress that Dr. Johnson failed to consider. There is no requirement under Montana or federal law that an expert who submits a written report must testify at a hearing to determine a prisoner's competency in order to make that proceeding adequate. *Dennis*, 378 F.3d at 893; *see also Wells v. Arave* (9th Cir. 1994), 18 F.3d 656, 658 (rejecting an argument that an absence of cross examination of a psychologist rendered a state court hearing inadequate); *see also Massie ex rel. Kroll v. Woodford* (9th Cir. 2001), 244 F.3d 1192, 1195-1197 (presuming a state court's competency findings were correct where medical doctors provided reports to the court).

¶43 Once it is determined that a defendant who wishes to withdraw his appeal is competent to do so, and that he acts voluntarily, such defendant is protected from further medical examination by his right to privacy, afforded by the Montana Constitution, Article II, Section 10. Thus, as it has been determined that Dawson's motion to withdraw was competent and voluntary, he may assert his right of privacy to bar any further evaluations or testimony from his doctors. *See Armstrong v. State*, 1999 MT 261, ¶ 35, 296 Mont. 361, ¶ 35, 989 P.2d 364, ¶ 35 (Article II, Section 10 of the Montana Constitution was intended to protect citizens from governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private).

¶44 Finally, Hooks and Ross argued to the District Court that § 46-14-221(1), MCA, entitles them as defendant's counsel to subpoena and cross-examine any psychiatrists or licensed clinical psychologists who joined in a report regarding the defendant's fitness to proceed. However, as Hooks and Ross recognize in their District Court brief, for § 46-14-221(1), MCA, to apply, the determination of a mental disease or defect must be relevant to a proceeding enumerated in § 46-14-101(1), MCA. Such a proceeding is not involved here. Section 46-14-221, MCA, does not apply and we decline to extend application of the statute to proceedings not authorized by § 46-14-101(1), MCA.

¶45 After an examination of the record we conclude that Dawson is not suffering from a mental disease, disorder, or defect, he has the capacity to appreciate his position, he has made a rational choice with respect to continuing or abandoning further litigation, and his motion to dismiss this appeal is voluntarily made.

NOW, THEREFORE, IT IS ORDERED as follows:

1. The motion of Dawson's counsel, Mr. Hooks and Ms. Ross, to file a supplemental brief, must be, and is hereby, DENIED.

2. The motion of David Thomas Dawson to discharge his counsel must be, and is hereby, GRANTED. Mr. William Hooks and Ms. Kathryn Ross are withdrawn as counsel for Mr. Dawson in this case.

3. Alternative counsel will not be appointed to represent Mr. Dawson. However, Mr. Edmund F. Sheehy, Jr., attorney at law, shall continue as stand-by counsel for Mr. Dawson.

4.  The motion of the Defendant herein, David Thomas Dawson, to dismiss this appeal must be, and is hereby, GRANTED.  This appeal is DISMISSED, with prejudice.

5.  This case is REMANDED to the District Court of the Thirteenth Judicial District, Yellowstone County, for execution of the judgment entered March 15, 1987, filed March 16, 1987, as provided by law.

6.  The Clerk of this Court shall mail a copy of this Order to the Hon. Gregory R. Todd, to Mr. Dawson, Mr. Sheehy, Mr. Hooks, Ms. Ross, and all counsel of record.

DATED this 11th day of April 2006.

> /S/ KARLA M. GRAY
> /S/ JOHN WARNER
> /S/ PATRICIA COTTER
> /S/ BRIAN MORRIS
> /S/ JIM RICE
> /S/ W. WILLIAM LEAPHART

Justice James C. Nelson concurs.

¶46   I concur in our Order and Opinion; however, I do so primarily on the following rationale.  In my view, Dawson has an Article II, Section 10, individual privacy right to determine to end his life by acceding to his sentence of execution, rather than remaining in prison for the rest of his life.  While I understand and appreciate that his attorneys have Dawson=s "best interests" at heart in trying to fight their client=s determination to end his appeals, since Dawson has now made his wishes known, those wishes represent his "best interests."  Because Dawson has been found to be mentally competent and able to make decisions about ending his appeals, then it is his expressed judgment that must

control, not that of his counsel.  While I disagree with Dawson that his counsel have any agenda in this matter other than protecting the rights of their client, Dawson has the paramount right to end his appeals, and thus his life, under the personal autonomy component of the right of individual privacy guaranteed under Article II, Section 10, of Montana=s Constitution.  *See*, *Armstrong v. State*, 1999 MT 261, && 56, 72, 296 Mont. 361, && 56, 72, 989 P.2d 364, && 56, 72.

/S/ JAMES C. NELSON